91 N.J. Super. 353 (1966)
220 A.2d 424
PETER KONSUVO, PLAINTIFF,
v.
ROBERT NETZKE, ET AL., DEFENDANTS. FRANK CIKUTOVICH, JR., AND THOMAS CIKUTOVICH, PLAINTIFFS,
v.
PETER KONSUVO, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided May 27, 1966.
*355 Mr. N. Patrick Quirk, attorney for Peter Konsuvo.
*356 Messrs. Breslin & Breslin, attorneys for Frank Cikutovich, Jr. and Thomas Cikutovich (Mr. Charles Rodgers, appearing).
Mr. John Tomasin, attorney for American Insulation Corp. and American Insulation Sales Co., Inc.
Messrs. Major & Major, attorneys for Vincent Dragich.
LORA, J.S.C.
These are consolidated actions by and between stockholders and officers of the defendant corporations in which plaintiff Peter Konsuvo seeks specific performance of an alleged agreement to sell stock, and Frank Cikutovich, Jr. and Thomas Cikutovich seek to restrain and enjoin such sale of stock and seek equitable relief from alleged attempted interference with existing corporate arrangements.
The parties to these actions are or have been all the stockholders of the two related defendant corporations, American Insulation Corporation and American Insulation Sales Co., Inc. The former corporation owns the real estate in Hackensack, New Jersey, at which the offices of the business are located; and the latter is the operating company, engaged as a competitive contractor in the business of insulating boilers, refrigeration and heating pipes, etc.
The individual defendants, other than the Cikutoviches and Konsuvo, filed no answers and did not formally appear in the case, although all were at the trial and testified. It was developed that George Brizich and Bel-Angela Mongelli are former stockholders and have no interest in the litigation. Vincent Dragich and Charles Karach hold the proxies of Robert Netzke and Mary Dickman, respectively, and are treated as the record and beneficial owners of their stock for purposes of these suits.
It has been stipulated that there are seven equal voting stock interests in the two corporations, which were formed in March 1959. These are held by plaintiff Peter Konsuvo, and Frank Cikutovich and Thomas Cikutovich, who are both *357 plaintiffs and defendants in the consolidated actions (the latter being a brother-in-law of Konsuvo's), and by defendants Nicholas T. Matich, Kruno Maricic, Charles Karach and Vincent Dragich.
Five of the seven equal stockholders, Peter Konsuvo, Frank Cikutovich, Thomas Cikutovich, Kruno Maricic, and Nicholas T. Matich, are salaried employees of the corporation, each receiving a weekly salary of approximately $267. Konsuvo is the president of the corporation, and the court finds he is the one among all of the stockholders who is fully familiar with the financial affairs and status of the corporations, the other stockholders, with the possible exception of Nicholas T. Matich, who assists Konsuvo in management, being concerned with the other aspects of the corporate business.
Under date of March 30, 1959 the parties entered into a "Stock Redemption Agreement" which prescribed the conditions under which any of the stockholders could offer his stock for sale. The agreement contains a provision that any stockholder desiring to dispose of any of his stock shall first give written notice to the corporation and to the other stockholders; that thereafter the corporation shall have 90 days within which to purchase such stock at its then net book value; that if the corporation does not purchase such shares within 90 days, said shares shall then be offered to the other stockholders at the same price, and each such stockholder shall have the right within 30 days to purchase his proportionate share of the stock offered for sale; that if any stockholder does not purchase his full proportionate allotment of the stock offered, the unaccepted stock may be purchased by the other stockholders; and that if all of the offered stock is not purchased before the expiration of the 90-day and 30-day periods, the offering stockholder may then dispose of his shares in any lawful manner, provided that he first give the corporation and the other stockholders the opportunity to purchase them on the same terms offered by any outsider.
The stock redemption agreement further provides that it "may be altered or amended in whole or in part at any time *358 by filing with this Agreement a written instrument setting forth such changes signed by the corporation and the stockholders."
On or about November 2, 1964 Brizich and his wife, who together owned one-eighth interest in the said corporations, decided to sell their holdings, and their interest was purchased by the corporations and their resignations accepted as directors.
The by-laws of the corporations were then amended to provide for seven members of the board of directors instead of the previous eight. The board of directors then consisted of the remaining stockholders.
Thereafter some dissension arose between the stockholders, principally Konsuvo and the Cikutoviches, Konsuvo stating that Frank Cikutovich and some of the others were not doing their jobs. On Sunday, September 19, 1965, Konsuvo called Maricic on the telephone and stated that he was sick and tired of everything and the way things were going, and that they could not go on the way they were  he was either going to buy or sell his stock. Calls were made by either Konsuvo or Matich to several of the other stockholders, and on September 20 all of the stockholders received a notice of a proposed stockholders' meeting to be held on September 25.
The notice stated that the purpose of the meeting was
"A. To discuss and vote on any and all proposals of any stockholder or proxy of stockholder for the purchase or sale of stocks held by any or all of the stockholders.
B. To discuss possible change and to vote on any suggested changes in the `buy and sell' agreement.
The attached sheet is one proposal which will be discussed at subject meeting but which is not the only proposal which may be discussed and voted on."
Attached to the notice of the meeting was a proposal by Peter Konsuvo
"(A) to buy any or all outstanding stock in American Insulation Corp. and American Insulation Sales Co., Inc. and to assume liabilities and assets in proportion to stocks then held or,
*359 (B) to sell all shares of stock held in American Insulation Corp. and American Insulation Sales Co., Inc. and thereby release myself and heirs from all liabilities and assets in accordance with the terms outlined below. Sale or Purchase Price: $15,000.00. Terms: 20% down and balance paid in three (3) years at 6% interest on unpaid balance except that if five (5) or six (6) total holdings are sold then the payment would extend to five (5) years."
The by-laws of the corporation provided that a special meeting of the stockholders could be called on not less than ten days' notice; nevertheless, all the stockholders met at the offices of the corporation on September 25. John Tomasin, Esq., attorney for the corporations, who knew of "the principals' difficulties and unhappiness" for some weeks before, also attended at the request of the corporations' secretary and several of the stockholders, and more particularly at Frank Cikutovich's request, and undertook to keep minutes of the meeting. He was asked to preside at the meeting in an effort to preserve order, and testified at the trial as to what occurred at the meeting and of the tenseness of the situation.
Copies of the minutes as drafted by him were delivered to the stockholders within a few days after the meeting, but the minutes were never formally approved, no stockholders' meeting being held subsequently. Tomasin testified that at the meeting the stockholders accepted the notice of the meeting, notwithstanding the by-laws' requirement of ten days' notice, and that all agreed to waive the ten-day notice, and further notice and formalities were unanimously waived. Tomasin was, on motion of Konsuvo, seconded by Maricic, asked by all present to conduct the meeting. A discussion then ensued as to Konsuvo's proposal, Frank Cikutovich saying the offer was not clear. Arguments ensued and then a "negotiation type of situation." There is some confusion as to whether Konsuvo first offered to sell his stock or to buy the stock of the others. He explained his proposal to the effect that each stockholder would be relieved of all liabilities; he would pay $15,000 for each block of stock, 20% down and the balance payable over a period of five years. On motion of Matich, seconded by Maricic, all stockholders waived any further *360 notice or formalities as to the proposal by Konsuvo to buy all of the outstanding stock. Konsuvo additionally proposed that if said purchase could not be made, he would sell his shares pursuant to the stockholders' agreement and be relieved from all liabilities.
The meeting was a stormy one and there was much heated discussion back and forth, with fast talking, yelling and the raising of voices. It would appear, and Konsuvo admitted, he did state "heads will roll" if they did not go along with his proposition. There was a discussion of business conditions, during which discussions Konsuvo painted a gloomy picture of the financial condition of the corporation and its prospects. He said things could not go on in that fashion  something had to be done. Almost everyone present testified at the trial that he relied upon Konsuvo, as the only one fully familiar with the true financial condition of the companies, for an accurate statement of their condition, which Konsuvo said was not good and that they would gradually go out of business if things continued as they were  that the company could not run for more than a couple of months, and if not decided in a few days, the company would fold up and go down the drain. The stockholders took seriously these representations by Konsuvo. The corporations (all stockholders so voting) rejected the proposal to purchase said stock and waived their right to a 90-day waiting period to purchase the same.
The court finds there was no physical violence for physical threats, or fear, or any threatened political reprisals against Frank Cikutovich, despite his testimony to the contrary as to political reprisals. Konsuvo insisted upon putting forth his proposal and demanded that the Cikutoviches decide what they were going to do. Either he would buy or he would sell. It would appear that Konsuvo stated that if he purchased the stock, all the others would be retained but at reduced salaries. At the trial he testified that at the September 25 meeting he told the others they could have two or three weeks to think it over but that the others wanted it resolved the same day. The court finds such testimony to be untrue, as it does Konsuvo's *361 testimony that it was in fact Frank Cikutovich who wanted the meeting of September 25.
The court observed the demeanor of the witnesses, has appraised their credibility, gives full credence to the testimony of Tomasin, and finds as a fact that Frank Cikutovich first indicated he did not want to participate in the meeting as such, and Tomasin made it clear that unless all agreed the meeting could not be held. Thereupon all present, including Frank Cikutovich, agreed to proceed. Thomas Cikutovich, who was apprehensive about proceeding, also agreed to waive the ten-day notice and go ahead with the meeting, despite Tomasin's telling them they could leave, and if they did so, no quorum would be present. The Cikutoviches were apprehensive and undecided as to the right thing to do; they were very troubled, their whole future being at stake and Thomas Cikutovich not being in good physical condition and being unable to work as well as formerly.
The stockholders, on being individually canvassed by Tomasin, waived their rights under the stockholders' redemption agreement to a 30-day period within which to purchase the stock, and waived further notice of sale, with the understanding that the highest bidder as between Konsuvo and Frank Cikutovich would be permitted to purchase all outstanding stock. Konsuvo was very insistent and persisted in ascertaining where he stood, stating he had to know  business was getting bad. Frank Cikutovich, who stated he didn't have sufficient time for such a grave and heavy decision, finally, although reluctantly, agreed to waive his 30-day right under the stock redemption agreement, and after saying a few times he needed more time and legal advice and that he had come to the meeting not to sell but to negotiate, finally agreed either to sell his stock to Konsuvo or to make a better offer at 10 A.M. on Saturday, October 2, 1965, at the offices of the corporation.
The draft of the proposed minutes prepared by Tomasin contains the language "time being of the essence," but Tomasin conceded in his testimony that there was never any such *362 statement by anyone at the meeting. Frank Cikutovich then again complained he would have only six days to go over the books of the corporation and think the matter over, and stated that he needed more time to consult professional people, such as accountants and others, and how to raise the money before making up his mind, but after "a knock down  drag out discussion" he nevertheless ultimately agreed to settle the matter at the October 2 meeting  either he would better Konsuvo's offer or sell; if he bettered the offer, then Konsuvo and he would bid against each other for everybody's stock. Cikutovich stated he would be at the meeting of October 2  that the company would be hurt if the matter dragged out. All left the meeting on an "agreed recessed basis  an armed truce had been effected."
Frank Cikutovich, Thomas Cikutovich and Vincent Dragich testified their understanding was that at the meeting to be held on October 2 Frank Cikutovich had the right to accept Konsuvo's offer, make a better offer, or to do nothing. Thomas Cikutovich contended he said to Tomasin he would not be part of the September 25 meeting if anything were binding, but then he said he left the fairness of the offer up to Matich and went along because Matich said it was a fair offer. The testimony of Charles Karach was that Frank Cikutovich had some figures on paper and said the company was all right, and why couldn't other arrangements be made, but then Frank Cikutovich agreed to either accept Konsuvo's offer or better the offer on October 2. Karach further testified that he never agreed to sell and that he would waive only if at the October 2 meeting a bidding procedure were set up. He then stated he was under no obligation to sell his stock to anyone, but signed a contract on October 13 because he wanted to get out for personal reasons and because he felt $15,000 was a fair price, not based on what Konsuvo said but based on his personal investment and for personal reasons. He felt no one was obligated at the close of the September 25 meeting.
*363 I find the greater weight of the testimony and the fact to be that all agreed on September 25 that Cikutovich would either raise Konsuvo's bid on October 2 or sell his stock to Konsuvo, and that the matter would be finally determined on that day and all the others would sell to either Konsuvo or Frank Cikutovich, depending on which of the two bid the highest.
In any event, on October 2 neither Frank nor Thomas Cikutovich appeared, but rather they sent a telegram stating
"Regret we cannot attend, due to circumstances beyond our control, and advice of counsel. Future of company deserves extra consideration."
Inasmuch as the by-laws, as amended, required the affirmative vote of all stockholders except one, no action could be taken at the October 2 meeting.
By undated letter mailed on October 2, 1965 the stockholders who appeared at the October 2 meeting drafted with Tomasin a letter to Frank and Thomas Cikutovich in which they stated:
"According to the agreement of all parties made on September 25, 1965 Pete was to acquire all outstanding stock ownership, as stated in the copy of the minutes that we all received, unless you appeared on October 2, 1965, today, to better the offer. Since you did not better the offer the agreement of September 25, 1965 stands, and Pete acquires all outstanding stock on his terms according to his offer which is set forth in the minutes that we all got.
However, your telegram was not quite clear and we do not want to ignore you or not hear whatever you might want to tell us, as we all have the welfare of all at heart.
We will be happy to meet with you at 138 Kansas Street, Hackensack, N.J. on Friday, October 8, 1965 at 8 p.m. at which time and place we will be glad to give you both a full hearing, and carefully hear or consider anything you might want to tell us or bring to our attention."
There was no meeting on October 8.
By letter dated November 24, 1965 Frank Cikutovich offered to purchase all outstanding stock interests in the corporation for $15,100 cash per share, but in the meantime *364 Peter Konsuvo had already instituted the first of these two actions. Concededly, this offer was made during settlement discussions between Konsuvo and the Cikutoviches, and the court concludes it is of no evidential value on the issues here involved. In any event, Konsuvo never accepted the November 24 offer and Karach, Maricic and Matich stated that they considered themselves bound by their written agreements of October 13 with Konsuvo. It appears that Maricic would have sold on the same basis even if the corporation were in better shape than Konsuvo had said, since Maricic knew about the corporation's status and, in his opinion, $15,000 was a fair price.
Some reference to the factual complex surrounding the meetings of September 25 and October 2 is appropriate. In August or early September 1965 Dragich met Konsuvo at a funeral parlor. In the course of their meeting Konsuvo stated that things looked pretty good that year and painted a rosy picture. Dragich's testimony was not contradicted by Konsuvo. However, at the September 25 meeting Konsuvo painted a different picture. He said there was no money and all would have to come up with some. (The company had been in difficulty once before and the parties had raised money to meet obligations.) Dragich testified that Konsuvo stated at the meeting that the corporation was very shaky and would not make money, and that they could not go on the way they were. It is further undisputed that the corporations, for the period March 1, 1965 to August 1965, had a profit of $6,000 on $500,000 of sales; that for the nine-month period ending November 30, 1965 the companies had actually earned more than $22,000 in net profit, in addition to which they had expended considerable sums of money for the improvement of their facilities, including air conditioning, a new truck, a new station wagon, and the hiring of a new secretary. For all of 1965 the companies had a profit of $11,000 on a sales volume of $983,000. In addition, according to the financial statement for the period ending November 30, 1965 the ratio *365 of accounts receivable to accounts payable was $135,000 to $69,310 or almost two to one.
Apparently the company is under-capitalized for the volume of work it does, and it would appear the company has always been in a short cash position. Karach testified he did not know the corporation would make a profit and that Konsuvo left the impression business would decline in a short time  that the corporation was going bad. Thomas Cikutovich testified that Konsuvo said that within a few months the company would no longer exist. Karach further said that while Konsuvo painted not too good a picture, he (Karach) realized there was more to it than that, and that internal dissension was a factor. Tomasin testified that book value was discussed at the meeting to the extent that Konsuvo said he had looked at the books, and while he did not know exact book value Konsuvo further stated his figure was what he had arrived at as being fair. No detailed break down of the company's finances was furnished or discussed, and it was Konsuvo's opinion the company was worth a little less than $105,000 as of August 31, 1965. Between September 20 and September 25 Frank Cikutovich and Konsuvo had discussed the company's financial situation, and Konsuvo had stated that if something were not done the companies would fall apart and capitulate in 30 days  that the provisions of the union's new contract would affect the company's backlog and profits.
While it is true that monthly "financial reports" were given to each stockholder, there was no testimony as to the scope of such reports and of what they consisted. The court finds the financial situation of the corporations was not as represented by Konsuvo at the September 25 meeting, and while all of the others had some knowledge of the financial weaknesses of the structure of the company, they were prevailed upon to sell by Konsuvo's dismal portrayal of the company's finances and prospects for the future. Because of his physical condition Thomas Cikutovich was particularly concerned about his future and felt insecure. Frank Cikutovich *366 was against the September 25 meeting but went into the room against his wishes and out of respect for the others and pressures upon him. He was "scared" about the company's finances as portrayed by Konsuvo, and the atmosphere and pressure of remarks of all others caused him to waive the thirty-day period against his better judgment and because of the "feelings of the men."
The facts as found by the court above are not such as to constitute coercion or duress. Our New Jersey Supreme Court, in Rubenstein v. Rubenstein, 20 N.J. 359, 365-368 (1956), clearly set forth the criterion. To constitute duress
"* * * `The threat must be of such a nature and made under such circumstances as to constitute a reasonable and adequate cause to control the will of the threatened person, and must have that effect; and the act sought to be avoided must be performed by such person while in such condition.' Fountain v. Bigham, 235 Pa. 35, 84 A. 131 (Sup. Ct. 1912). * * * moral compulsion or psychological pressure may constitute duress if, thereby, the subject of the pressure is overborne and he is deprived of the exercise of his free will. * * *" (at p. 366)
See also 17 Am.Jur.2d, § 153, p. 504.
There must be coercion or compulsion to such an extent that there is a loss of volition by one of the parties which prevents the exercise of his free will. As stated in 17 C.J.S. Contracts § 168, at p. 948:
"The conduct of the dominant party if it is to constitute duress vitiating the contract, must have been such as actually to override the volition of his victim and destroy the free assent and agency necessary to the creation of a valid contract, and mere threats of any character which fall short of subverting the will of the intended victim cannot constitute duress. * * *"
The circumstances herein do not satisfy that test.
The threats made with respect to the jobs held by the Cikutoviches did not constitute such coercion as would nullify the transactions here involved. Then, too, it must be remembered that attorney Tomasin was present throughout the meeting and several times made it forcibly clear to all concerned, and particularly the Cikutoviches, that they were *367 free to leave at any time and if they did so there could and would be no meeting. He also emphasized that no one could make them waive their rights under the stock redemption agreement or compel them to waive any notice provisions. While it is clear that there were, as found above, threats and pressures, the court concludes that they fell far short of duress or coercion within the meaning of the cases.
Plaintiff contends that "a director of a corporation is not, because of his office, in duty bound to disclose to an individual stockholder, before purchasing his stock, that which he may know as to the real condition of the corporation affecting the value of the stock" and "is not a trustee for the stockholders with respect to their several holdings of stock over which he has no control." Gardner v. Baldi, 24 N.J. Super. 228 (Ch. Div. 1952); Crowell v. Jackson, 53 N.J.L. 656 (E. & A. 1891); Connolly v. Shannon, 105 N.J. Eq. 155 (Ch. 1929), affirmed 107 N.J. Eq. 180 (E. & A. 1930). But here Konsuvo did affirmatively make representations as to the financial position of the company which were calculated to and did, in fact, instill in the others a fear and uneasiness which, when coupled with the pressures of the September 25 meeting, precipitated their decision to sell to either Konsuvo or Cikutovich at the October 5 meeting.
Furthermore, although business was carried on under corporate form, the parties were all closely associated and sought to restrict ownership of the stock; all had an equal interest in the corporation, and all but two drew identical salaries, so that, in a sense, they were partners, Konsuvo being, in effect, the managing partner. As such there was a confidential relationship, in furtherance of which Konsuvo owed to the others a duty of full disclosure. Intentional misrepresentation and concealment of material facts renders a transaction voidable at the option of the defrauded party. A fortiori, where the perpetrator of the wrong stands in a fiduciary relationship, a court of equity will be especially prone to grant relief. It has been demonstrated that Konsuvo misrepresented the condition of the company's affairs *368 as well as its future prospects. As previously stated, although legally and technically a corporation, many of the attributes of a partnership are here present, and a fundamental characteristic of a partnership is that the relation between the partners is one of trust and confidence when dealing with each other in relation to partnership matters. 40 Am. Jur., Partnership, § 17, p. 137. Each partner is, in one sense, a trustee and at the same time a cestui que trust. Ibid.; Annot., 115 Am. St. Rep. 402; 3 Pomeroy's Equity Jurisprudence (5th ed. 1941), § 963, p. 859. As stated in Pomeroy v. Benton, 57 Mo. 531 (Sup. Ct. 1874) (quoted at 120 A.L.R., at p. 727):
"That every partner is the agent of his copartner is a very familiar doctrine, and it arises from the necessities of the copartnership relation. A doctrine equally well settled, though not yet hackneyed through frequent quotation, is that the same rules and tests are applied to the conduct of partners as are ordinarily applicable to that of trustees; and that the duties, functions, rights, and obligations of partners may be for the most part comprehended by the same words which define those of trustees and agents. * * * The relations of trust and confidence existing between the plaintiff and himself (the defendant) placed him under an equitable obligation to communicate all he knew of the matter then pending to the plaintiff, to `make a clean breast of it,' to disclose to him all the material facts within his knowledge touching the negotiation then in progress, as fully as though he had stepped upon the witness stand and kissed the Book. and nothing short of a complete disclosure of this sort could exonerate the defendant from a charge of undue concealment, which, under circumstances like the present, is, in the sense of a court of equity, itself a fraud." (Emphasis added.)
The demands of such fiduciary relationship are especially pertinent and precise where one partner in exclusive control of the management of the firm's business assumes to purchase the interest of his co-partner. See Gilbert & O'Callighan v. Anderson, 73 N.J. Eq. 243 (Ch. 1907). While it appears that the price offered by Konsuvo was basically a fair one, there is no doubt that his actions at the meeting of September 25 were the motivating factors in bringing about the acquiescence of most of the others  concededly one, at least, having testified he was anxious to get out anyhow. The *369 majority of the parties testified that they would not have agreed to sell if they had known the true picture of the corporation's status.
Under the circumstances of the case here involved the following language of Judge Cardozo in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (Ct. App. 1928), is pertinent:
"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the `disintegrating erosion of particular exceptions'. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."
In 8 Williston on Contracts (3d ed.), § 947B, pp. 86-87, it is said:
"Such fiduciary relation is not limited to cases of trustee and cestui que trust, guardian and ward, attorney and client, or other recognized legal relations, but it exists in all cases where confidence is reposed on the one side and a resulting superiority and influence on the other side arises therefrom. The origin of the confidence is immaterial."
See also 17 Am.Jur.2d, § 154, pp. 505-506, under the heading "Undue Influence," where it is stated:
"Whenever the relationships between the parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that unfair advantage in a transaction is rendered probable either because of superior knowledge of the matter derived from a fiduciary relationship or from overmastering influence on the one side, or from weakness, dependence, or trust justifiably reposed on the other side, the presumption is that the transaction is invalid, and it is incumbent on the stronger party to show affirmatively that no deception was practiced or undue influence used and that every thing was fair, open, voluntary, and well understood. In order to render this rule applicable, it is not necessary that one of the parties occupy such a dominant position toward the other as to justify the inference *370 that the latter was without power to assert his will in opposition to the former. Nor is the rule confined to cases in which the relationship between the parties is of a strictly fiduciary nature. It applies whenever a confidential relationship exists as a fact or whenever dominion may be exercised by one of the parties over the other.
Equity may relieve against a transaction on the ground of undue influence where it is the result of a moral, social, or domestic force exerted upon a party, controlling the free action of his will and preventing any true consent, even though there is no coercion amounting to actual duress and no invalidity at law."
In Slack v. Rees, 66 N.J. Eq. 447 (E. & A. 1903), the court stated:
"In all transactions between parties occupying relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, or, in fact, reasonably exists, the burden of proof is thrown upon the person in whom the confidence is reposed, and who has acquired an advantage, to show affirmatively not only that no deception was practiced therein, no undue influence used, and that all was fair, open and voluntary, but that it was well understood." (at p. 449)
Konsuvo was the only person in the company with full knowledge of the financial circumstances of the same, and all but one of the parties relied upon his representations as to the financial status of the corporation. He painted a dark picture of the company's future: that the company could not last much longer; it was going bad and down the drain. In fact, after making certain improvements, hiring a new secretary, and purchasing a new station wagon and an International truck, the business still realized a net profit after all salaries of at least $11,000 for 1965, if not $13,000, and for the nine months' period ending November 30, 1965 it earned $22,000 net profit.
Despite the fact there was an agreement between the parties on September 25, 1965, Konsuvo's actions, in view of his confidential relationship with the other stockholders, prevent him from enforcing the same. This would be so even though there were no intent to deceive, since in equity it is sufficient if the representations are shown to be, in fact, not true. Konsuvo was obliged to come forward and sustain the *371 burden of establishing that the transaction was valid and that no deception was practiced or undue influence used, but this he failed to do. A court of equity applies concepts of constructive fraud which, unlike actual fraud, requires no intent to deceive or obtain unfair advantage. See Pomeroy, op cit., § 922. As stated in Hagan v. Dundore, 187 Md. 430, 50 A.2d 570, 575 (Ct. App. 1947):
"It is not necessary to establish that there has been actual fraud or imposition practiced by the party holding the confidential or fiduciary relation;  the onus of proof being upon him to establish the perfect fairness, adequacy and equity of the transaction."
This doctrine of constructive fraud and presumptive invalidity is set forth by Professor Pomeroy in 3 Equity Jurisprudence (5th ed.), § 956, pp. 790-791:
"We are now to view fiduciary relations under an entirely different aspect; there is no intentional concealment, no misrepresentation, no actual fraud. The doctrine to be examined arises from the very conception and existence of a fiduciary relation. While equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption.
One principle underlies the whole subject in all its applications; and this principle may be stated in a negative and in affirmative form. Its negative aspect cannot be better expressed than in the following language of a most able judge: `The broad principle on which the court acts in cases of this description is, that wherever there exists such a confidence, or whatever character that confidence may be, as enables the person in whom confidence or trust is reposed to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with the person so trusting him.'" (Emphasis added)
There is some testimony that the price offered by Konsuvo was a fair one, although the court notes it was to be paid over a five-year period. However, the court repeats  Konsuvo's *372 actions at the September 25 meeting were the motivating factor in bringing about the acquiescence of most of the others, one of whom did testify he was anxious to get out anyhow. But the majority of the stockholders testified they would not have agreed to sell if they had known the true picture of the company's financial status.
The parties have stipulated that Chapter 8 of the Uniform Commercial Code  "Investment Securities" (N.J.S. 12A:8-101 et seq.) applies to the sale of stock in the subject corporations.
Plaintiff's position is that the minutes of the said special stockholders' meeting of September 25, 1965 contan all the essentials of a valid contract in that (a) all parties to the agreement are clearly identified; (b) the subject matter, stock of the respective parties; (c) the consideration  price to be paid; (d) the terms of payment, and (e) the time of performance.
It is plaintiff's contention that the minutes of the meeting of September 25, 1965 also satisfy subparagraph (a) of the statute of frauds of Chapter 8 (N.J.S. 12A:8-319 (a)). The statute provides:
"(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price;
(b) delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment; or
(c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt; or (d) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price."
Apparently no cases in point have been reported on this section of Chapter 8, so plaintiff argues by analogy to other statutes of fraud and cites section 101 of Williston on Sales:
*373 "* * * the memorandum may of course be in the form of a carefully prepared written contract but it may also be, in whole or in part, in the form of a letter or letters, * * * records of municipal offices or of a private corporation, * * *." (at pp. 250, 251-252; emphasis added)
He also cites 4 Williston on Contracts (3d ed.), § 568, p. 34, wherein it is stated that under certain circumstances corporate records may satisfy the statute of frauds. See Fanney v. Virginia Investment and Mortgage Corp., 200 Va. 642, 107 S.E.2d 414 (Sup. Ct. App. 1959), and Preis v. Eversharp, Inc., 154 F. Supp. 98 (D.C.S.D.N.Y. 1957), which respectively involved an employment contract set forth in a stockholders' resolution signed by the corporate secretary and in the minutes of a board of directors' meeting signed by the secretary of the corporation. In Argus Co. v. Mayor, etc., of City of Albany, 55 N.Y. 495, 501 (Ct. App. 1874), the court stated:
"* * * and in the minutes of the day's doings of the body, being signed by the Clerk thereof, there is a subscription of the note or memorandum made by the party, by its agent duly authorized. This is a satisfactory compliance with the statute. It meets the purposes and intention of the law by providing an enduring and unchanging evidence of the agreement; and it meets its letter, for there is some note or memorandum of it in writing subscribed by the party to be charged thereby, the subscription made by an authorized agent."
Konsuvo argues that one person may act as the agent to both parties to a contract for the purpose of signing a memorandum that will satisfy the statute of frauds, but not act as agent for both parties for the purpose of entering into the contract. He points out that an agent's authority to sign a memorandum which will satisfy a statute of frauds need not be in writing unless the statute in question specifies such written authority. He contends it was the understanding of all parties herein that a record of what was agreed upon would be made in the form of the corporate minutes and subscribed to by the corporate secretary, thereby making the secretary their agent for the purpose of reducing their agreement *374 to writing, and thus the minutes signed by the corporate secretary constitute a sufficient written record subscribed by a duly authorized agent of the Cikutoviches to satisfy the provision of N.J.S. 12A:8-319(a), even though the minutes refer to subsequent written agreements for effecting the sale of all stock (Comerata v. Chaumont, Inc., 52 N.J. Super. 299 (App. Div. 1958).
The New Jersey Study Comment in the Annotation of N.J.S. 12A:8-319, note 6, states:
"He must produce proof sufficient to satisfy the requirements of Section 8-319 before he can attempt to prove the terms of his contract. * * * It is no longer necessary to produce a memorandum. The plaintiff merely has to produce a signed writing sufficient to `indicate that a contract has been made' (for sale of a stated quantity of described securities at a defined or stated price). * * * The important elements which must appear in the signed writing are the quantity of described securities and a definable or stated price." (at p. 271)
Plaintiff Konsuvo attempts to establish the existence of a writing signed by an authorized agent of the defendants Cikutovich when, in fact, no such agency existed. In Fanney, supra, cited by plaintiff, the defendant corporation attempted to plead the statute of frauds to avoid a contract of employment, but the corporate resolution of employment was signed by the secretary of the corporation and hence by an agent of the corporation. But here no agency relationship was created.
"An agency relationship exists only if there is a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act."
Section 15 of Restatement of the Law, Agency, p. 50 (1933).
In order for an agent to bind a principal there must be authorization to do so, but no such authority is present in the case at bar.
"It is settled law in this state that the statute of frauds is satisfied with the signature of an agent to an agreement to convey lands, provided the agent has express authority to bind the principal by writing *375 and this authority may be by parol. * * * courts should require the proof of authority in an agent to sign a memorandum in writing for the sale of lands by parol to be clear and decisive. This, of course, means not only that proof of the authority generally must be clearly and decisively shown, but also that the agent had authority to make all of the terms for his principal which he incorporates into the agreement." Campbell v. Hough, 73 N.J. Eq. 601, 606 (Ch. 1907).
Here the agency sought to be established by Konsuvo was allegedly between Cikutovich and Matich, the secretary of the corporation. Yet Tomasin, the attorney who conducted the meeting, prepared the minutes of the meeting and thereafter they were signed by Secretary Matich without having ever been adopted or ratified by the stockholders.
Accordingly, the court concludes that in addition to a denial of specific performance because of a breach of fiduciary relationship, specific performance must also be denied for failure of the alleged agreement to meet the requirements of N.J.S. 12A:8-319.
Plaintiff Konsuvo asserts also that if the minutes of September 25, 1965 are not sufficient to satisfy subparagraph (a) of N.J.S. 12A:8-319, then the undated letter of October 2, 1965 to the defendants Cikutovich does satisfy the requirements of subparagraph (c). He states said letter was a confirmation of the terms agreed upon on September 25, 1965 and reduced to writing in the form of the minutes  the fact that reference must be made to the minutes for the exact terms of the agreement creates no impediment since it is a matter of general contract law that the incorporation of an extrinsic document by reference is permissible if said reference is clearly spelled out.
However, the court concludes that the undated letter of October 2, 1965 does not satisfy the requirements of the statute of frauds, N.J.S. 12A:8-319 (c), which provides that a written confirmation of the sale or purchase may take the contract out of the statute. It is clear that in order for a written confirmation to do so, such confirmation must be sufficient against the sender under paragraph (a). But the undated letter of October 2, 1965 was deficient in that it did *376 not indicate that a contract had been made for sale of a stated quantity of described securities at a defined or stated price. Not only does the statute contain no provision for incorporation by reference in the written confirmation of the sale of the provisions of another document, but it would appear the very purpose of the statute would be defeated by any such concept.
Reference is made to the Uniform Commercial Code comment on pages 272 and 273:
"1. What will be sufficient specification will vary with the circumstances. Where the transaction is on an exchange or an over-the-counter market where daily quotations of the security are available `100 shares X. Corp. comm. @ market' should suffice. If there is no readily available standard to interpret `@ market' there is no `defined or stated price.' 2. Paragraph (c) is particularly important in the relationship of broker (Section 8-303) and customer. Normally a great volume of such business is done over the telephone. Orders are executed almost immediately and confirmed on the same or the next business day, usually on standard forms which as to the broker more than meet the minimal requirements of paragraph (a). It is reasonable to require the customer to raise his objection, if any, within ten days after the confirmation has been received. (Section 1-201)."
In view of all of the foregoing, and since all parties obviously intended to effect an acquisition of all of the stock of the corporations either by Konsuvo or the Cikutoviches, the court concludes that judgment should be entered in favor of all of the defendants and against plaintiff Konsuvo and that the written agreements of October 13, 1965 between Konsuvo and Maricic, Matich and Karach be set aside. Additionally, the court finds that all but one of the defendants would not have agreed to sell at the September 25, 1965 meeting if the true financial condition of the companies were known to them at that time; and hence all parties are restored to the status which existed before the notice of September 20, 1965.
An appropriate form of judgment, consented to as to form or settled on notice, will be submitted to the court.