## In re HUNT'S PIER ASSOCIATES, Debtor.

### Bankruptcy No. 91–15644S.

United States Bankruptcy Court, E.D. Pennsylvania.

July 10, 1992.

David S. Fishbone, Ciardi, Fishbone & DiDonato, Philadelphia, Pa., for debtor.

Justin G. McCarthy, Adelman Lavine Gold & Levin, Philadelphia, Pa., for movant.

Thomas J. Elliott, Elliott, Bray & Riley, Blue Bell, Pa., for RTC.

Samuel E. Klein, Kohn, Klein, Nast & Graf, P.C., Philadelphia, Pa., for Leon Silverman and Elias Stein.

Mark S. Halpern, Furman & Halpern, Bala Cynwyd, Pa., for David Kami.

Michael H. Kaliner, Jackson, Cook, Caracappa & Bloom, Fairless Hills, Pa., for Theodore Snyder.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Before this court is a motion of Vekoma International B.V. ("Vekoma") requesting a determination that the automatic stay does not apply to its right to foreclose upon certain amusement rides claimed to be owned by the Debtor-partnership, Hunt's Pier Associates ("the Debtor"). The rides were pledged as security to Vekoma by New Hunt's Pier Corporation ("the Corporation"), an entity which the Debtor allowed to manage and operate an amusement pier containing the rides. In the al-

ternative, Vekoma seeks relief from the automatic stay, contending that it has a valid lien against the rides superior to a security interest in the rides which is prior in time held by Atlantic Financial Federal ("AFF"), represented by its successor's receiver, the Resolution Trust Corp. ("the RTC").

The motion presents several issues for determination by the court: (1) Whether the rides at issue are owned by the Debtor, the Corporation, or some other entity; (2) The effect of this determination upon Vekoma's security interest in the rides; (3) Whether any security interest of Vekoma is superior to that of AFF; and (4) The impact of all of the foregoing upon Vekoma's right to obtain relief from the Debtor's automatic stay to foreclose upon its putative security interest.

This court concludes as follows:

(1) The rides are not the property of the Corporation, but only two are owned by the Debtor;

(2) Vekoma nevertheless appears to have a valid security interest in all of the rides;

(3) Vekoma's security interest in the rides is not superior to that of AFF;

(4) Vekoma's security interests in two of the rides are potentially avoidable by the Debtor's Trustee; and

(5) In light of (3) and (4) *supra*, Vekoma's request for relief from the automatic stay must be denied as to those two rides.

(6) The automatic stay does not apply to the third ride, but it is questionable, under state law, what rights it can assert in that ride.

## B. PROCEDURAL HISTORY

This matter arises in connection with the voluntary Chapter 11 bankruptcy case commenced by the Debtor on October 23, 1991. The administration of this case has been as topsy-turvy as the facts giving rise to the motion at issue, largely because both are the final product of destructive in-fighting among Leon Silverman and Elias Stein, two of the Debtor's partners, on one hand; and David Kami, a third partner, on the other. A dispute also rages as to whether the original fourth partner, Theodore Snyder, has been bought out or remains a partner in some capacity.

At the outset of the case, Silverman and Stein, who apparently had chosen the Debtor's counsel, attempted to chart the case's direction, while Kami furiously attempted to vindicate his counter-interests. The RTC, neutral in the intra-partner disputes, changed the course of this case dramatically by filing, on January 10, 1992, a motion to appoint a trustee, principally based upon the need for an arbitrator to quell the dissention among the partners. Kami followed, on February 4, 1992, with his own similar motion to appoint a trustee.

Vekoma filed the instant motion on February 18, 1992, the day before the February 19, 1992, hearing on both motions to appoint a trustee. At the close of that hearing, we ordered the appointment of an examiner, directing that the examiner provide a report to the court prior to a continued hearing on March 11, 1992, on the motions to appoint a trustee. Accountant Robert Brennan, appointed as examiner, performed his duties in timely, exemplary fashion and recommended the appointment of a trustee. Subsequent to our Order of March 11, 1992, directing the appointment of a trustee, Hershel Kozlov ("the Trustee") was appointed on April 6, 1992.

During the unsettled period between February and April, Vekoma agreed to continue the disposition of its motion to April 8, 1992, and again to May 13, 1992. In the meantime, after a process too tortuous to attempt to describe, a consensus was reached that the crown jewel of the Debtor's holdings, an amusement pier in Wildwood, New Jersey, would be leased to Snyder for the fast-approaching 1992 summer season, with an option for Snyder to purchase it after that season. By May 13, 1992, Snyder was well into the process of preparing the pier for the public, and the disposition of the rides, which is the subject of the instant motion, became ripe for resolution.

On May 13, 1992, despite the fact that potential witnesses for both sides were un-

available, all parties were anxious for a resolution of this matter. They decided to present it on a paper record. By agreement of the interested parties, we entered an Order of May 14, 1992, directing the parties to prepare and file with this court, by May 20, 1992, a Stipulation of Facts ("the Stipulation"), which would constitute the record in this matter. Any interested parties were accorded an opportunity to file Briefs in support of their respective positions by June 3, 1992 (favoring the Motion), and June 17, 1992 (opposing it).

The Stipulation included, as Exhibits, depositions of Silverman, Kami and Snyder. Unfortunately, all provisions of the Stipulation were not unanimously agreed upon by the interested parties. Nevertheless, no party demanded a hearing, and the Stipulation remains the record. After Vekoma submitted its statement of the facts and Brief, the Trustee, the RTC, and Snyder submitted Briefs containing counterstatements of facts and argument in opposition to the Motion.

## C. FACTUAL HISTORY

From a review of the Stipulation and the counterstatements of facts in the parties' Briefs, we find that the following are the relevant facts.

The Debtor was formed in June, 1985, as a partnership of Silverman, Stein, Kami, and Snyder. On August 16, 1985, the Debtor entered into an asset purchase agreement ("the Purchase Agreement") with Hunt's Theaters, Inc. The Purchase Agreement provided that the Debtor would purchase certain parcels of real estate, including "Hunt's Pier," an amusement pier platform and deck, including all rides, vehicles, theater equipment, inventory, equipment and supplies, located at 2701–21 Boardwalk, Wildwood, New Jersey ("the Pier"); and various other real estate holdings and interests in Wildwood and other nearby communities in Southern New Jersey.

On February 28, 1986, the Debtor entered into a Loan and Security Agreement with AFF ("the AFF Agreement") to finance the Purchase Agreement. The AFF Agreement provided that AFF would lend the Debtor $10 million. In exchange, AFF was granted, *inter alia,* a first mortgage pledging all of the real estate, fixtures, machinery and equipment acquired under the Purchase Agreement as collateral for the loan. In addition, AFF was given "a first priority lien and security interest in all Accounts, Equipment, General Intangibles and Inventory . . . now owned or hereafter acquired by the Borrower." On March 3, 1986, AFF filed a UCC–1 Financing Statement in Cape May County, New Jersey, covering the properties listed in the AFF Agreement.

Following consummation of the purchase, the Debtor began to manage and operate the acquired properties. Silverman was selected as the managing and tax partner. Snyder, the only one of the partners who had experience operating amusement facilities, was assigned the role of managing the day-to-day operation of the Pier.

In 1987, the Debtor purchased several additional amusement rides for the Pier. They included the "Bertazzon Double Decker Carousel" ("the Carousel"), for a purchase price of $235,000, and the "Raider Ride," for an unstated purchase price. The Pier was also provided the use of a Kiddie roller coaster, known as the "Go–Gater" ride. These three rides will be referred to collectively hereafter as "the Rides."

Both Kami and Snyder claim ownership of the Go–Gater. Snyder asserts that he purchased and acquired title to the Go–Gater in the name of Sportland Investments, which operates a separate small amusement pier in Wildwood. Kami contends that he and Snyder each paid one-half of the purchase price of the Go–Gater and that its title was to be placed in Kami's name.

Discord soon developed among the partners, however, and litigation ensued which has continued ever since. One attempt at resolving these disputes was a July, 1988, settlement which provided that Kami, Silverman, and Stein would redeem Snyder's partnership interest in the Debtor for $2.3 million. There is a dispute as to whether

this $2.3 million was paid and whether Snyder consequently remains a partner.

Thereafter, in July, 1988, the three remaining partners entered into an agreement which proposed to divide the assets and liabilities among them, with distribution to occur on April 1, 1991 ("the July Agreement"). The July Agreement was amended and restated in an October, 1988, letter agreement ("the October Letter"). The October Letter provided, *inter alia*, that Kami was given the exclusive right to manage and operate the Pier and the Ocean Block, a group of properties owned by the Debtor which are contiguous to the Pier. It also provided that Kami would operate the Pier through a corporation to be formed and known as D & S Pier Company, Inc. ("D & S Pier"). The October Letter further provided that the Debtor's indebtedness to AFF would remain, and that each partner would be responsible for paying a specified percentage of that indebtedness. The October Letter did not, however, provide or require any transfer of ownership or title to any partnership assets prior to April 1, 1991.

Upon execution of the October Letter, the partners began to manage and operate the partnership assets in the manner provided therein. Kami formed the Corporation, rather than D & S Pier, and began to operate the Pier under that entity. During his operation of the Pier, Kami, through the Corporation, purchased from Vekoma a new "adult" roller coaster. The roller coaster was installed upon the Pier and used during the 1989 summer season. Thereafter, on April 3, 1989, Kami, in his capacity as president of the Corporation, obtained a loan from Vekoma in the amount of 600,000 Dutch Guilders, or $300,000 ("the 1989 Loan"). To secure the 1989 Loan, Kami executed, on behalf of the Corporation, a security agreement providing Vekoma with an alleged security interest in the Rides. Vekoma recorded this security interest against the Corporation. The validity of this security agreement is the wellspring of the present dispute.

The agreement among the three remaining partners proved to be short-lived. They soon became embroiled in disputes over the operation of the Pier and the payment of the outstanding mortgage to AFF. Thereafter, the control and operation of the Pier teetered back and forth between Kami, on the one hand, and Silverman and Stein, on the other. Ultimately, through decisions by Judicate, which was designated as an arbiter of potential disputes among the parties in the Purchase Agreement, Silverman and Stein gained control of the Pier. During this time period and thereafter, no payments were made to Vekoma on the 1989 Loan.

On December 19, 1990, an arbitration award was entered in favor of Vekoma and against the Corporation in the amount of 677,178 Dutch Guilders, plus attorneys fees and costs. Subsequently, Vekoma obtained an Order and Judgment in the United States District Court Southern District of New York confirming the arbitration award. Vekoma then attempted to execute upon the Rides. The Partnership claimed ownership of the Rides, and then filed bankruptcy, leading to the filing of the motion in issue.

### D. DISCUSSION

1. THE RIDES ARE NOT OWNED BY THE CORPORATION; THE CAROUSEL AND THE RAIDER RIDE ARE OWNED BY THE DEBTOR AND THE GO–GATER IS OWNED BY SNYDER.

■ In order to determine whether Vekoma's claims against the Rides are subject to the automatic stay or exempt therefrom, we must first determine what interest, if any, the Debtor has in the Rides. The nature and extent of the Debtor's interest in the Rides is determined by state law. *See, e.g., In re Dascoli's Inc.*, 49 B.R. 519, 521 (Bankr.E.D.Pa.1985).

■ The Rides are and always have been located in New Jersey. The parties appear to agree that the resolution of the issues regarding them is therefore controlled by New Jersey law. Accordingly we begin by looking to New Jersey law's definition of partnership property. In that respect,

N.J.STAT.ANN. § 42:1–8 (West 1991), provides as follows:

**Partnership property**

1. All property originally brought into the partnership stock or subsequently acquired by purchase or otherwise, on account of the partnership is partnership property.

2. Unless the contrary intention appears, property acquired with partnership funds is partnership property.

3. Any estate in real property may be acquired in the partnership name. Title so acquired can be conveyed only in the partnership name.

4. A conveyance to a partnership in the partnership name, though without words of inheritance, passes the entire estate of the grantor unless contrary intent appears.

In *Fortugno v. Hudson Manure Co.*, 51 N.J.Super. 482, 497–98, 144 A.2d 207, 215 (1958), the New Jersey Superior Court, quoting 1 *Barrett and Seago, Partners and Partnerships, Law and Taxation*, C. 3, § 3.2, at 174–176 (1956), thusly set forth the method for determining what is partnership property:

"There have been many cases involving the question of what was and what was not partnership property. In deciding these cases the courts have almost invariably sought to ascertain the intent of the partners, be it expressed or implied, from the nature and form of the transaction. Coupled with this same line of inquiry is the question of what motivated the partners (partnership) so far as the property in question is concerned.

It may be said that when partnership funds are used to purchase property that the property so acquired is presumed to be partnership property. The fact that the title to such property is taken in the name of an individual partner or partners or in the name of a third person does not change this result. The presumption stated above is rebuttable. * * *

For real property to be partnership property it must have been purchased with partnership funds and the use thereof must be by the partnership.

In considering the subject of what is the separate property of the partners and what is partnership property we come again to the matter of the intention of the parties. This intention is to be determined from the partnership agreement, the conduct of the parties and, to a lesser extent, by the use that is made of the property. * * *"

Here, the evidence presented, the bill of sale and the testimony of Kami and Snyder, clearly establishes that the Carousel and the Raider Ride are property of the Debtor-partnership. In contrast, there was no evidence presented which even suggested that the Debtor had any ownership of the Go–Gater. Rather, the evidence presented indicates that Snyder is the owner of the Go–Gater. Although Kami testified that he and Snyder each paid for one-half of the Go–Gater and title was put in his name, Kami's testimony was insufficient to overcome the evidence presented by Snyder in support of his claim of ownership, *e.g.*, a cancelled payment check and the parties' consensus on this issue in a Judicate hearing involving all four of the partners, where the Go–Gater was admitted by all to be the property of Snyder. Therefore, we conclude that the Carousel and Raider Ride were and are property of the Debtor and that the Go–Gater was and is the property of Snyder.

Vekoma contends that the automatic stay does not apply to its claim and/or that it is entitled to foreclose upon the Rides because the owners transferred all interest in them to the Corporation. Vekoma asserts that the transfer is evidenced by the actions of the Debtor and its partners which gave possession and control of the Rides to the Corporation. The parties opposing Vekoma have countered that no transfer of ownership of the Rides from the Debtor to the Corporation occurred.

New Jersey law provides that possession of personal property is *prima facie* evidence of its ownership. *Spagnuolo v. Bonnet*, 16 N.J. 546, 554, 109 A.2d 623, 627 (1954); and *State v. Sherry*, 86 N.J.Super. 296, 300, 206 A.2d 773, 775 (1965), *rev'd on other grounds*, 46 N.J.

172, 215 A.2d 536 (1965). Further, the party claiming ownership against the possessor of the property has the burden of overcoming the presumption of ownership. *Redmond v. New Jersey Historical Society*, 132 N.J.Eq. 464, 469, 28 A.2d 189, 192 (1942); and *O'Keeffe v. Snyder*, 170 N.J.Super. 75, 83–84, 405 A.2d 840, 844 (1979), *rev'd on other grounds*, 83 N.J. 478, 416 A.2d 862 (1980). *Cf. In re Atlantic Marble, Inc.*, 126 B.R. 463, 466–67 (Bankr.E.D.Pa.1991) (applying Pennsylvania law).

Here, the Rides at issue were in the possession of the Corporation when it entered into the loan transaction with Vekoma and hence a presumption arises that it owned them at that time. Accordingly, the parties opposing the claim of the Corporation's ownership had the burden of refuting this presumption. These parties advance principally the terms of the October Letter to attempt to overcome the presumption. They argue that certain provisions of the October Letter clearly evidence that the Debtor retained ownership of the Rides at all times relevant to the matter before the court.

In determining whether the provisions in the October Letter were sufficient to rebut the presumption of ownership by the Corporation, we note that page 8 of the October Letter was omitted from all of the copies of the Letter in the court record. Moreover, from the context of the remaining pages, it appears possible that this page may have addressed the specific issue of "ownership" of rides on the Pier. Consequently, the October Letter, in the form that it appears in the record, is ambiguous on its face. Therefore, we must look to the "totality of the circumstances" surrounding the agreement set forth in the October Letter to ascertain the intent of the parties thereto as to ownership of the Rides. *See Communications Workers of America, Local 1087 v. Monmouth County Bd. of Social Services*, 96 N.J. 442, 452, 476 A.2d 777, 782 (1984); *Wheatly v. Sook Suh*, 217 N.J.Super. 233, 238, 525 A.2d 340, 344 (1987); and *Anthony L. Petters Diner, Inc. v. Stellakis*, 202 N.J.Super. 11, 27–28, 493 A.2d 1261, 1270 (1985). *Cf. Taylor v.*

*Continental Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1232–35 (3d Cir.1991) (applying federal law).

The evidence presented by the parties indicates that the October Letter was formulated in preparation for the dissolution and distribution of the partnership assets, scheduled under its terms to occur on April 1, 1991. The contents of the October Letter are therefore not intended to effect an immediate transfer of ownership of partnership assets. The October Letter was therefore sufficient to rebut the presumption that the Corporation's was vested with ownership of the Rides at the time that it was prepared.

Once the presumption of ownership of the Rides by the Corporation was rebutted, the burden of proof shifted to Vekoma to prove that the ownership of the Rides was transferred to the Corporation. *See Atlantic Marble, supra*, 126 B.R. at 466–67. Vekoma failed to offer adequate proof of a transfer of ownership to the Corporation.

Specifically, Vekoma was able to offer, in support of its claim of the Corporation's ownership, only the testimony of Kami that he "believed" that, since the October Letter required the Pier to be operated through a corporation, all of the Pier assets were transferred to the Corporation. Since the court has determined that the October Letter was not intended by the parties to effectuate an immediate transfer, Kami's "belief" is insufficient to establish the requisite proof of the Corporation's immediate ownership of the Rides.

Therefore, at the time of the Corporation's loan from Vekoma, the Carousel and the Raider Ride remained the property of the Debtor and the Go–Gater remained the property of Snyder.

2. UNDER NEW JERSEY PARTNERSHIP LAW, KAMI LACKED THE AUTHORITY TO TRANSFER THE RIDES OWNED BY THE PARTNERSHIP TO THE CORPORATION.

■ In addition to our conclusion that the Partnership rebutted the presumption

of the Corporation's ownership of the Rides, we find that New Jersey law governing the ability of a partner to transfer partnership assets requires that we find that the Rides owned by the Debtor—the Carousel and the Raider Ride—remained partnership assets and were not transferred to the Corporation.

In *Fortugno, supra,* the Court addressed the issue of whether a partner could transfer partnership assets to a new corporation established to operate the partnership business absent the approval of all of the partners. The court held that

> [l]ess than all the partners in a partnership may not bind the partnership by an act or acts not performed for the purpose of carrying on the usual business of the partnership, unless authorized by the other partners. Uniform Partnership Act, R.S. 42:1–9, N.J.S.A. This applies particularly to a situation where one or several partners, but not all, seek to incorporate a partnership and transfer the assets of the partnership to the new corporation.... Where such acts are not ratified by the other partners, the property remains that of the partnership and may be traced into the corporation; the new corporation need not be dissolved (it may remain the organization of the partners who incorporated it), but no assets of the partnership can remain in it....

51 N.J.Super. at 498–99, 144 A.2d at 215–16. *See also,* N.J.STAT.ANN. § 42:1–9 (West 1991); *In re Lloyd Securities, Inc.; In re Soroker v. Goldstein Management Inc.,* Pro. No. 90–0985S and Bankr. No. 91–12978S, Adv. No. 92–0217S, slip op. at 19–27, 1992 WL 165962 (Bankr.E.D.Pa. July 10, 1992); *Knight v. Cohen,* 56 N.J.Super. 516, 522, 153 A.2d 334, 338 (1959), *aff'd,* 32 N.J. 497, 161 A.2d 473 (1960); *Real Estate-Land Title & Trust Co. v. Stout,* 117 N.J.Eq. 37, 43, 175 A. 128, 131 (1934); and *Carr v. Hertz,* 54 N.J.Eq. 127, 132, 33 A. 194, 196 (1895).

Here, the evidence presented by the parties clearly established that the Carousel and the Raider Ride were purchased by the Debtor and hence were assets of the Debtor. Accordingly, under N.J.STAT.ANN.

§ 42:1–9(2), the transfer of the two Rides to the Corporation, by Kami, could occur only if Kami was authorized to effect such a transfer by all of the other partners.

Vekoma failed to present any evidence that such authorization was granted to Kami. Rather, Vekoma presented, as proof that the Debtor authorized a transfer of the Pier assets to the Corporation, only portions of the October Letter requiring that the Pier be operated as a corporation and Kami's "belief" that a transfer was intended. Vekoma's arguments are directly contradicted by the October Letter, which states "[t]he term of the partnership agreement shall continue until April 1, 1991, at which time the partnership shall be dissolved and the assets distributed...." Furthermore, Silverman testified that no transfer of assets from the Debtor to the Corporation was intended under the October Letter. Vekoma's evidence was therefore insufficient and failed to prove that the partners authorized a transfer of the Rides to the Corporation. Accordingly, on this basis, also, we find that the Carousel and the Raider Ride remained property of the Debtor.

### 3. THE DEBTOR AND SNYDER ARE NOT EQUITABLY ESTOPPED FROM DENYING A TRANSFER OF THEIR ASSETS TO THE CORPORATION.

■ Vekoma argues that, even if a valid transfer of ownership of the Rides to the Corporation did not occur, a fact Vekoma appears prepared to concede, at least as an alternative, in its Brief, the owners of the Rides are equitably estopped from denying that such a transfer occurred.

■ New Jersey law provides that equitable estoppel will arise when a party, through culpable negligence, induces another to believe that certain facts exist, and that other party reasonably relies and acts on such a belief. Imposition of an equitable estoppel is designed to assure that the loss is borne by the party who made an injury possible or could have prevented it. *See Miller v. Miller,* 97 N.J. 154, 163, 478 A.2d 351, 355 (1984); *Carlsen v. Masters,*

*Mates, & Pilots Pension Plan Trust,* 80 N.J. 334, 339–42, 403 A.2d 880, 882–83 (1979); and *Fairken Associates v. Hutchin,* 223 N.J.Super. 274, 538 A.2d 465, 468 (1987).

In *Foley Machinery Company v. Amland Contractors, Inc.,* 209 N.J.Super. 70, 506 A.2d 1263 (1986), the court discussed the elements required to establish a finding of equitable estoppel. There, the lower court had dismissed the conversion claims of the owner of a stolen truck tractor and its insurer, holding that the owner was equitably estopped from recovering because it was chargeable with contributory negligence. The contributory negligence allegedly occurred when the owner repaired the stolen vehicle while in the possession of the buyer and failed to " 'discover or check its records to determine that this was, in fact, the [stolen] tractor they were seeking.' " 209 N.J.Super. at 75, 506 A.2d at 1266. In reversing the lower court decision, the Court found that

> [e]quitable estoppel requires proof of a "misrepresentation or concealment of material facts, known to the party allegedly estopped and unknown to the party claiming estoppel, done with the intention or expectation that it will be acted upon by the other party and on which the other party does in fact rely in such a manner as to change his position for the worse." *Carlsen v. Masters, Maters & Pilots Pension Plan Trust,* 80 N.J. 334, 339, 403 A.2d 880 (1979). The reliance must be reasonable and justifiable. *New Jersey Bank v. Palladino,* 146 N.J.Super. 6, 13, 368 A.2d 943 (App.Div.1976), *mod. on other grounds,* 77 N.J. 33, 389 A.2d 454 (1978). The burden of proof is on the party asserting the estoppel. *Miller v. Miller,* 97 N.J. 154, 163, 478 A.2d 351 (1984).

209 N.J.Super. at 75–76, 506 A.2d at 1266. *Cf. In re Webb,* 99 B.R. 283, 290 (Bankr. E.D.Pa.1989) (discussing consistent federal law). Applying the aforesaid principles to the issue before it, the court found that the proofs were insufficient "to establish that Foley [the owner] misrepresented or concealed any material facts." 209 N.J.Super. at 76, 506 A.2d at 1266. Rather, the court

found that it was the buyer who had acted unreasonably in purchasing a machine

> from a person who said nothing more than that he had obtained the machine as payment for a debt; Alpine made no inquiry of the seller as to where he had gotten the machine or the propriety of his having done so. Alpine thus elected not to make the essential inquiries that would have disclosed the paramount interests of Amland and Foley [insurer and owner].

*Id.* Therefore, the court found that the loss could not "equitably" be placed upon the owner. 209 N.J.Super. at 76, 506 A.2d at 1267.

Applying the *Foley* rationale to the instant facts, we conclude that Vekoma may have established that the "true" respective owners of the Rides "misrepresented" or "concealed" the fact that the Rides were not owned by the Corporation. Kami testified that, pursuant to the October Letter, the Corporation purchased rides from Vekoma. Silverman testified that he spoke with Kami on matters affecting the Pier, including the "build[ing] of a roller coaster" on the Pier. Silverman also testified that, once the roller coaster was installed, the Debtor granted AFF a security interest in that ride. These two facts indicate that the Debtor, through Silverman, its managing partner, was aware and knew that Kami, through and under the Corporation, was purchasing rides from at least one seller which were being installed on the Pier. Yet, the Debtor made no attempts to disclose to other interested parties, or to insist that Kami disclose to such interested parties, that the Pier, and at least some of the rides thereon, were property of other parties, and not of the Corporation.

█ Although it thus perhaps established that the Debtor "concealed" the fact of the true ownership of the Rides, Vekoma failed to establish that its reliance on that "concealment" was reasonable. Equitable estoppel requires that the party asserting it take "reasonable" steps to ascertain the truth of the facts upon which it

relies. *See Foley, supra,* 209 N.J.Super. at 75–76, 506 A.2d at 1266–67.

In *Atlantic Marble, supra,* a case in many senses factually similar case to the instant matter, we denied the claim of a bank which asserted a security interest in certain equipment of the debtor. The bank argued that its security interest was valid because the debtor had transferred ownership of the equipment to the corporation which granted the bank a security interest in the property as consideration for the making of the loan. In rejecting the bank's claim of equitable estoppel against the debtor, we stated, *id.* at 468, that

> it is not clear that the Bank could have established the requisite lack of any means on its part for ascertaining the true ownership of the Equipment. Therefore, it would have been unlikely to have convinced us that it reasonably relied on ... representations. [The borrower] was a very new company having in its possession Equipment which obviously was not new and therefore must have been acquired elsewhere....

> These facts should have suggested to the Bank that extreme caution in investigation of [the borrower's] ownership of these assets would have been prudent. However, [the bank officer] admitted that the Bank made no inquiry ... regarding [the borrower's] purported acquisition of the Equipment.

The rationale applied by this court in *Atlantic Marble* is equally applicable to the present matter. Like the borrower in *Atlantic Marble,* the Corporation was, at the time that it signed the security agreement with Vekoma, a "very new company." Similarly, it had in its possession the Rides, which obviously were not new and therefore must have been acquired elsewhere.

Vekoma attempted to diminish the significance of these facts by asserting that it conducted a UCC filing search on the property of the Corporation that revealed no prior liens on the Rides. This "investigation" was clearly insufficient to establish the ownership of the Rides. If anything, the lack of prior liens against the Corporation on the Rides would tend to support the conclusion that the Corporation was *not* the owner of the Rides.

Vekoma overlooked the most reliable and easily-acquired proof of ownership—requiring the purported owner to produce the bills of sale for the Rides. Vekoma could simply have requested that the Corporation provide that information as proof of ownership for the Rides. It failed to do so. This failure on the part of Vekoma cannot be "equitably" placed upon other parties. Because of its own lack of reasonable vigilance, Vekoma is precluded from asserting equitable estoppel against the "true" owners of the Rides.

### 4. VEKOMA MAY HAVE A SECURITY INTEREST AGAINST THE RIDES OWNED BY THE DEBTOR.

The Uniform Commercial Code ("the UCC"), enacted by New Jersey, requires that, for a security interest in property to be valid and enforceable against the owner or third parties, the following requirements must be met:

(1) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral ...;

(2) Value has been given; and

(3) The debtor has rights in the collateral.

N.J.STAT.ANN. § 12A:9–203 (West 1991).

The only element which appears to be in dispute is the requirement that the "debtor has rights in the collateral." The RTC and the Trustee argue that Vekoma's alleged security interests in the Rides is unenforceable because the Rides were not owned by the Corporation and therefore the Corporation could not provide Vekoma with any valid security interest in the Rides.

We believe that, as to the Rides owned by the Debtor, the Corporation could be found to have the authority to grant Vekoma security interests therein because the Corporation was acting as the agent of the Debtor. The creation of an agency relationship does not depend upon intent of the parties to create it or a belief

of the parties that it was created. Rather, it is dependent upon the manifest conduct of the parties. *In re Pritchard & Baird, Inc.*, 8 B.R. 265, 269 (D.N.J.1980), *aff'd sub nom Hartford Fire Ins. Co. v. Francis*, 673 F.2d 1299, 1301 (3d Cir.1981).

▉ Admittedly, the party seeking to impose liability upon an alleged principal on a contract made by an alleged agent has the burden of proving the agency relationship. *See N. Rothenberg & Son, Inc. v. Nako*, 49 N.J.Super. 372, 383, 139 A.2d 783, 789 (1958); and *Hoddeson v. Koos Bros.*, 47 N.J.Super. 224, 231–32, 135 A.2d 702, 706 (1957). However, proof of an agency relationship can be established from circumstantial evidence. *See Murin v. Frapaul Construction Co.*, 240 N.J.Super. 600, 612, 573 A.2d 989, 995 (1990); and *Hoddeson, supra*, 47 N.J.Super. at 233–34, 135 A.2d at 706. Further, one can "look" to the conduct of the parties to provide the evidence. *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 374, 161 A.2d 69, 78 (1960).

The evidence and record before this court might well be sufficient to establish an agency relationship between the Debtor and the Corporation. The October Letter required that Kami organize a corporation for the "operation, maintenance and insurance of the Pier." Pursuant to that request, Kami formed the Corporation, which operated and maintained the Pier. The conduct of the parties appears to provide that the Debtor, as principal, requested the Corporation, as agent, act on the Debtor's behalf in the operation of the Pier.

▉ An agency relationship does not automatically obligate the principal for liabilities created by its agent. Rather, the actions of the agent must have been authorized by the principal. *See Konsuvo v. Netzke*, 91 N.J.Super. 353, 220 A.2d 424 (1966). However, authority granted to an agent may be actual or "apparent." "Apparent authority" is the power to bind the principal which a principal has not actually granted, but which the principal leads persons with whom the agent deals to believe that the principal has granted. *See Lampley v. Davis Machine Corp.*, 219 N.J.Super.

540, 548, 530 A.2d 1254, 1259 (1987); *Nappen v. Blanchard*, 210 N.J.Super. 655, 663, 510 A.2d 324, 328–29 (1986); *Wilzig v. Sisselman*, 209 N.J.Super. 25, 35–36, 506 A.2d 1238, 1243 (1986); and *Shadel v. Shell Oil Co.*, 195 N.J.Super. 311, 478 A.2d 1262 (1984). *Cf. United States v. Martinez*, 613 F.2d 473, 481 (3d Cir.1980); and *Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 85 (3d Cir.), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960) (applying federal law).

The prerequisites for establishing "apparent authority" may have been established in this matter as to the Rides owned by the Debtor. Firstly, the Partnership, through the October Letter, required that the Pier be operated by the Corporation. The Corporation was to manage and maintain the Pier and insulate the Partnership from possible calamities and liabilities. Under this arrangement, the Corporation held itself out as the "owner" of the Pier. Secondly, Vekoma proved that it relied upon this "appearance" of ownership. Thirdly, Vekoma's reliance on the "appearance" of ownership was reasonable, given the business dealings between Vekoma and the Corporation resulting from the Corporation's purchase of a roller coaster from Vekoma.

We note, however, that there is no similarly documented agency relationship between Snyder and the Corporation. Therefore, we cannot find that Vekoma has any security interest against the Go–Gater under this theory. However, we do find that Vekoma may well have a valid security interest in the Carousel and the Raider owned by the Debtor under this theory.

5. AFF'S SECURITY INTERESTS IN THE RIDES OWNED BY THE DEBTOR ARE PRIOR TO ANY SUCH RIGHTS OF VEKOMA.

▉ Vekoma contends that its security interests in the Rides are superior to those of any of the Debtor's other creditors claiming security interests in the Rides, particularly AFF. The RTC, on behalf of AFF, counters this argument, stating that AFF has valid and perfected security inter-

**48**

ests in the Debtor's property superior to those of any other creditor, including Vekoma.

The competing claims of Vekoma and AFF are controlled by the UCC, N.J.STAT. ANN. § 12A:1–101, *et seq.* (West 1991). Article 9 of the UCC governs secured transactions. N.J.STAT.ANN. § 12A:9–312 sets forth the methods for resolving conflicts which occur among competing security interests in the same collateral. AFF has a purchase money security interest in Debtor's presently-owned and after-acquired assets, since the loan between AFF and the Debtor was made for the purchase of the Debtor's assets from Hunt's Theaters, Inc. The relevant portion of N.J.STAT.ANN. § 12A:9–312, *i.e.*, § 9:312(4), is applicable to this issue, and provides as follows:

> A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral if the purchase money security is perfected at the time the debtor receives possession of the collateral or within ten days thereafter.

Under this provision, AFF's security interest in the Debtor's assets, including its Rides, has priority over any subsequent security interests therein, provided that it complied with the requirements of § 9–312(4). The parties do not dispute that AFF's security interest was validly perfected. Accordingly, AFF's security interest under § 9–312(4) has priority over any competing security interest.

Alternatively, Vekoma requests that we grant it an equitable lien upon the Debtor's Rides superior to that of AFF. Vekoma contends that AFF's lien should be subordinated because it did not act in "good faith." Specifically, Vekoma alleges that AFF knew that the Debtor had assigned the Pier to Kami for operation under a corporate entity. It therefore characterizes AFF's filing as a "secret lien" against the Rides. Further, it notes that AFF subsequently filed a UCC–1 as to the Carousel only on April 5, 1989, which it contends constitute an admission that its prior UCC–1 filing may have been defective. We reject Vekoma's assertions on this point for the following reasons.

One of the basic principles underlying the UCC is that the performance or enforcement of every contract or duty under it requires an obligation of "good faith." N.J.STAT.ANN. § 12A:1–203, Comments (West 1991). "Good faith" is defined as "honesty in fact in the conduct or transaction concerned." N.J.STAT.ANN. § 12A:1–201 (West 1991). *See Martin Marietta Corp. v. New Jersey Nat'l Bank,* 612 F.2d 745, 751 (3d Cir.1979); *Sea Harvest, Inc. v. Rig & Crane Equipment Corp.,* 181 N.J.Super. 41, 50, 436 A.2d 553, 558 (1981); *Lustrelon, Inc. v. Prutscher,* 178 N.J.Super. 128, 144, 428 A.2d 518, 526 (1981); and *Farmer's & Merchants Nat'l Bank of Bridgeton v. Boardwalk Nat'l Bank,* 101 N.J.Super. 528, 535, 245 A.2d 35, 38 (1968).

In support of its lack of good faith argument, Vekoma relies upon *In re Zenith Laboratories, Inc.,* 104 B.R. 667 (Bankr. D.N.J.1989); and *Shallcross v. Community State Bank & Trust Co.,* 180 N.J.Super. 273, 434 A.2d 671 (1981). Although forced to admit that the respective courts in these cases found that the conduct complained of did not rise to a level of "bad faith," Vekoma argues that AFF's relevant actions were much more egregious than the actions in issue in those cases.

Vekoma's argument is unpersuasive. In *Shallcross,* the court refused to find a lack of good faith because the record was devoid of any evidence that showed that the putative secured party "led others on" and thus engaged in bad faith or inequitable conduct on the part of the secured party. 180 N.J.Super. at 281, 434 A.2d at 676. Similarly, we find that the record before this court contains no evidence that AFF "led on" Vekoma or acted in any inequitable manner. Rather, AFF provided a loan to the Debtor in 1985 and timely filed a UCC–1 securing its interest in the Debtor's present and future assets. Although AFF was provided a copy of the October Letter which indicated that the Pier was to be operated by a Corporation, the Letter did not evidence any intention by the Debt-

or to effectuate an immediate transfer of the Pier or any other asset. *See* N.J.STAT. ANN. § 12A:9–402(8) (West 1991). Hence, AFF had no reason to suspect that Kami, acting for the Corporation, would attempt to encumber the Debtor's property when he did.

We therefore determine that AFF did not act in violation of the "good faith" requirements of the UCC. It is difficult to conceive of how any sort of estoppel could operate against AFF, since we have concluded, that, due to Vekoma's own failure to investigate ownership of the Rides, no equitable estoppel operated even against the Debtor. *See* pages 45–46 *supra*. We also note that, since AFF's UCC–1 filing was proper, it is inappropriate to designate its security interest in the Debtor's Rides as a "secret lien." There is no evidence as to the motivation for AFF's second UCC–1 filing against the Carousel. However, AFF's first UCC–1 filing was valid. A second filing, though unnecessary, certainly would not invalidate an earlier, proper filing. We therefore conclude that Vekoma is not entitled to have its security interests in the Rides deemed superior to those of AFF.

### 6. ANY SECURITY INTEREST OF VEKOMA IN THE DEBTOR'S ASSETS IS AVOIDABLE BY THE TRUSTEE.

 Vekoma has therefore established that, under the principles of agency law, it arguably has a security interest against the Rides owned by the Debtor, the Carousel and the Raider Ride. We note, however, that this security interest is junior to that of AFF in those same Rides. We also note that there is insufficient evidence that Vekoma has any valid security interest against the Go–Gater owned by Snyder.

However, we further observe that any security interest of Vekoma against the Debtor would clearly be subject to avoidance by the Trustee under 11 U.S.C. § 544. That Bankruptcy Code section provides that the Trustee may avoid certain claims against the debtor's estate which, outside of bankruptcy, would not be avoidable.

*See, e.g., In re Capital Center Equities,* 137 B.R. 600, 609–10 (Bankr.E.D.Pa.1992); and *In re Rice,* 133 B.R. 722, 728 (Bankr. E.D.Pa.1991). This result follows because these "strong-arm" provisions of the Code permit the trustee to stand in the shoes of a hypothetical "ideal" lien creditor or judgment creditor, or a *bona fide* purchaser of a debtor's real property. *Capital Center, supra,* 137 B.R. at 608. As an ideal creditor or *bona fide* purchaser, the trustee is entitled to avoid any improperly perfected security interest, even though that interest that may be perfectly valid between the debtor and its creditor. *See In re Stebow Construction Co.,* 73 B.R. 459, 462 (Bankr. D.N.J.1987).

 Under New Jersey's UCC, a financing statement is sufficient if it (1) gives the name of the debtor and the secured party; (2) is signed by the debtor; (3) gives an address of the secured party from which information regarding the security interest can be obtained; (4) gives a mailing address of the debtor; and (5) contains a statement indicating the types, or describing the items or collateral. N.J.STAT. ANN. § 12A:9–402(1). Further, a financing statement sufficiently provides the name of the debtor only if it gives the correct individual, partnership or corporate name of the debtor, whether or not it adds other trade names or the names of partners. N.J.STAT.ANN. § 12A:9–402(8) (West 1991).

 The purpose of a financing statement is to put a searcher on notice that an underlying security agreement may be outstanding. *See Pinkerton's, Inc. v. John A. Roebling Steel Corp.,* 186 N.J.Super. 10, 450 A.2d 1336 (1982). Therefore, the financing statement must contain sufficient information to put the searcher on notice that further inquiry is warranted. *Bank of North America v. Bank of Nutley,* 94 N.J.Super 220, 227 A.2d 535 (1967). This requires that the name of the debtor be completely accurate in order that a searcher will be able to ascertain the debtor's identity. *Stebow, supra,* 73 B.R. at 467. *Cf. In re Marta Group, Inc.,* 33 B.R. 634, 639 (Bankr.E.D.Pa.1983) (slight dis-

crepancy in name of debtor justifies avoidance of security interest) (applying Pennsylvania law). When the financing statement contains the name of a debtor which is "seriously misleading," the filing will be found to be unperfected. *Id.* An unperfected security interest is unenforceable against an "ideal creditor." *Id.*

In the matter *sub judice* the financing statement filed by Vekoma does not include the name of the Debtor, against whose Rides Vekoma arguably has a valid security interest. Instead, it provides the name of the Corporation. Consequently, the financing statement is "misleading" and would not place a searcher on notice of Vekoma's security interest in the Debtor's Rides. Under New Jersey law, security interests which are improperly recorded are unenforceable against an "ideal creditor." Since the Trustee stands in the shoes of an "ideal creditor," he would be able to avoid any unperfected security interest of Vekoma in the Debtor's Carousel and the Raider Ride. *See Stebow, supra,* 73 B.R. at 467. Therefore, Vekoma's security interests in the Debtor's Rides, if they are found to exist at all, would clearly be avoidable.

7. SINCE THE VALIDITY OF VEKOMA'S SECURITY INTEREST AGAINST THE RIDES OWNED BY THE DEBTOR IS AT BEST DOUBTFUL, VEKOMA IS NOT ENTITLED TO RELIEF FROM THE STAY TO ENFORCE ITS RIGHTS AS TO THOSE RIDES.

There is little doubt that, since the Carousel and Raider Ride are owned by the Debtor, the automatic stay applies to any attempt of Vekoma to foreclose upon those Rides under applicable non-bankruptcy law. A creditor is entitled to relief from the automatic stay only if it can produce some evidence that it meets the criteria of 11 U.S.C. §§ 362(d)(1) or (d)(2). *See In re Stranahan Gear Co.,* 67 B.R. 834, 836–38 (Bankr.E.D.Pa.1986). Vekoma's request for relief is based on the claim that it has a valid security interest in the Rides and that this interest is not adequately protected. *See* 11 U.S.C. § 362(d)(1). The Motion also

purports to be based upon 11 U.S.C. § 362(d)(2). However, relief under § 362(d)(2), requiring, as it does, a debtor's lack of equity in the property regarding which relief is sought, is only appropriately granted when the movant has a security interest in that property. Even as to § 362(d)(1), a "valid secured status, while not a prerequisite, is a very important factor to be considered in deciding whether a moving party is entitled to relief from the automatic stay per 11 U.S.C. § 362(d)." *In re Tashjian,* 72 B.R. 968, 972 (Bankr. E.D.Pa.1987).

The alleged secured party bears the burden of proving the validity of its security interest in the debtor's property. *See In re Harris,* 115 B.R. 376, 377 (Bankr. M.D.Fla.1990); and *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 376, 385–86 (Bankr.E.D.Pa.), *aff'd,* 75 B.R. 819, 822–23 (E.D.Pa.1987). If a bankruptcy court has a serious doubt about the validity of the movant's security interest in the debtor's property, this factor weighs heavily upon the court's determination of a § 362(d) motion. *See In re Cabrillo,* 101 B.R. 443, 451 (Bankr.E.D.Pa.1990); *In re Rice,* 82 B.R. 623, 626 (Bankr.S.D.Ga.1987); *In re Gurst,* 75 B.R. 575, 579 (Bankr. E.D.Pa.1987); *In re Paolino,* 72 B.R. 555, 558 (Bankr.E.D.Pa.1987); *In re Dennison,* 50 B.R. 950, 955 (Bankr.E.D.Pa.1985); and *United Companies Financial Corp. v. Brantley,* 6 B.R. 178, 185 (Bankr.N.D.Fla. 1980).

If the movant cannot convince the court that it is seeking to enforce a valid security interest upon the debtor's property in exercising relief from the stay, it is thrust into the posture of an unsecured creditor. Relief from the automatic stay is available to an unsecured creditor, under § 362(d)(1), only if the balance of hardships tips in the movant's favor. *See In re Metro Transportation Co.,* 82 B.R. 351, 353 (Bankr.E.D.Pa.1988); and *In re Cherry,* 78 B.R. 65, 72–74 (Bankr.E.D.Pa.1987).

We have concluded that any security interests which Vekoma has in the Carousel and the Raider Ride are not only subor-

dinate to the security interests of AFF, but also are avoidable by the Trustee. Therefore, for all practical purposes, the status of Vekoma, as to these Rides, is that of an unsecured creditor. Since the Rides are an important and integral aspect of the Pier, it does not appear that the balance of hardships tips in Vekoma's favor.

We therefore conclude that, as to these Rides, the automatic stay arising from the Debtor's bankruptcy filing applies, and Vekoma is not entitled to relief from the automatic stay as to its efforts to foreclose upon them.

### 8. THE AUTOMATIC STAY DOES NOT APPLY TO THE RIDE OWNED BY SNYDER, BUT THIS RESULT MAY NOT BE HELPFUL TO VEKOMA.

 We have determined that the Go-Gater is the property of Snyder, not the Debtor. No possessory or other interest of the Debtor in that Ride has been identified. *Compare In re Orfa Corp. of Philadelphia,* 129 B.R. 404, 422 (Bankr.E.D.Pa. 1991) (the automatic stay protects any interest of a debtor in property, not only its ownership interest). Therefore, it does not appear that the automatic stay arising from the Debtor's bankruptcy filing applies to the Go-Gater. Vekoma may therefore exercise whatever state-law rights it has in the Go-Gater against its owner, Snyder.

This decision may not, however, be of great comfort to Vekoma. We were compelled to decide many issues relevant to the ownership and secured status of the Go-Gater in the course of determining the Debtor's rights to same, and the sum total of these decisions throws question upon Vekoma's rights to obtain possession of the Go-Gater under state law.

We have determined that the owner of the Go-Gater is Snyder, not the Corporation. Therefore, Vekoma's recorded security interest in the Go-Gater, identifying it as property of the Corporation, is of doubtful efficacy. We did *not* hold that Snyder vested the Corporation with agency power to encumber his Go-Gater, as we held in reference to the Debtor's actions as to the other Rides. *See* page 47 *supra.* It is therefore difficult to conceive of how Vekoma could have any security interest in the Go-Gater, avoidable or otherwise.

However, there has been no showing of a possessory or ownership interest of the Debtor in the Go-Gater. Therefore, this court lacks jurisdiction to make any further determinations in regard to the rights of Vekoma and Snyder to possession of this Ride *inter se.* The decision as to the ultimate disposition of the Go-Gater is therefore in the hands of a court which does not, as does this court, draw its jurisdictional powers from the Debtor's bankruptcy filing.

### E. CONCLUSION

For all of the reasons stated above, we will enter an Order granting Vekoma's motion only insofar as it requests a determination that the automatic stay arising from the Debtor's bankruptcy case does not apply to the Go-Gater, but denying it in all other respects.