**In re HUNT'S PIER ASSOCIATES,
Debtor.**

**Bankruptcy No. 91–15644S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

May 20, 1993.

Hersh Kozlov, Kozlov, Seaton, Romanini & Brooks, Cherry Hill, NJ, trustee.

David S. Fishbone, Ciardi, Fishbone & DiDonato, Philadelphia, PA, for debtor.

William Serber, Serber, Konschuk & Taquett, Ocean City, NJ, Dean C. Waldt, Davis, Reberkenny & Abramowitz, Cherry Hill, NJ, for Baumgardner Const. Co., Inc.

Thomas J. Elliott, Elliott Bray & Riley, Blue Bell, PA, for Resolution Trust Corp.

Michael H. Kaliner, Jackson, Cook, Caracappa & Bloom, Fairless Hills, PA, for Theodore Snyder.

Frederic Baker, Philadelphia, PA, Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Before us are Objections of HUNT'S PIER ASSOCIATES ("the Debtor") to Proof of Claim No. 17 ("the Claim"), filed by BAUMGARDNER CONSTRUCTION COMPANY, INC. ("the Company") as a secured claim in the amount of $1,208,-165.00, for services performed by the Company in the erection of a huge roller coaster ride ("the Ride") on Hunt's Pier, an amusement pier ("the Pier") located in Wildwood, New Jersey, which we previously referenced as the Debtor's "crown jewel." *See In re Hunt's Pier Associates,* 143 B.R. 36, 39 (Bankr.E.D.Pa.1992) (*"Hunt I"*).

The bases for the Objections are several, but the Debtor's best contention is that it should not be rendered liable on an oral agreement for the services negotiated between David Kami, a general partner of the Debtor placed in charge of the Pier pursuant to intra-partner agreements, and the Company's principal, George A. Baumgardner, because Baumgardner believed that Kami was the owner of the Pier; relied solely upon Kami's statements and assets as a basis for entering into the contract; and was totally unaware of the Debtor's existence.

We determined, in the course of the hearing, that the Company's mechanic's lien was invalid against the Debtor, because it named a different entity, Hunt's Pier Associates, *Inc.,* as the record owner of the Pier. We now hold that the Debtor stands in the shoes of an undisclosed principal of a general manager (Kami) of its Pier. As such, it is liable for even unauthorized acts of Kami which were "usual" to its business. We find that the instant contract was not so unusual to the Debtor's business as to preclude the Debtor's liability, and hence we will allow the Company a general unsecured claim in a slightly-reduced amount.

### B. PROCEDURAL HISTORY

The instant controversy arose in the course of administration of a voluntary Chapter 11 bankruptcy case filed by the Debtor on October 23, 1991. The history of this case through July, 1992, is related in some detail in *Hunt I,* 143 B.R. at 38–41, in which we considered the rights of Vekoma International, B.V. ("Vekoma"), the manufacturer of certain rides on the Pier other than the Ride in issue, to obtain relief from the automatic stay to foreclose on these rides. Although we will incorporate rather than reiterate many of the facts set forth in *Hunt I,* we must initially observe that the history of the Debtor has been riddled with disputes among the four original partners since its formation in June, 1985. These partners included an Israeli entrepreneur (Kami); an individual with experience of operations in the Wildwood amusement scene (Theodore Snyder); and two

Philadelphia lawyer-investors, Leon Silverman and Elias Stein (collectively "S & S").

The disputes among the parties continued through the filing of this case. In the early stages of the case, S & S, who proceed in lock-step, attempted to seize control. This effort was initially halted by motions for appointment of a Chapter 11 Trustee by the Debtor's principal creditor, the Resolution Trust Corp. ("the RTC"), acting in its capacity as receiver for Atlantic Financial Federal ("AFF"), and Kami initially resulted in the appointment of Robert Brennan as an examiner on February 19, 1992, and, per Brennan's report, the appointment of Hersh Kozlov as Trustee ("the Trustee") on April 6, 1992.

On May 12, 1992, this court approved an agreement between the Trustee and Snyder pursuant to which Snyder would operate the Pier in 1992 and have an option to purchase it prior to the 1993 season. The *Hunt I* Opinion of July 10, 1992, which concluded that Vekoma had no right to relief as to two of the rides in issue that we found were owned by the Debtor, furthered the Debtor's and Snyder's common ends. As is noted at pages 439, 448–49 *infra,* some of our holdings in *Hunt I* support the result in the instant controversy, because, like the instant dispute, that decision addressed the rights of third-party creditors against the Debtor, in the contrast of its muddled status as a partnership marked by constant warfare and an influx of attempted-resolutions among the partners.

The plan confirmation process began with a filing of a plan by the Debtor, acting on behalf of S & S, on April 30, 1992. In the course of an extensive negotiation process, first Kami, then the Trustee, and then the RTC came on board as supporters of the Debtor's Third Amended Plan ("the Plan"). The Plan was confirmed on February 10, 1993, with the only real dissent, mostly claiming that the Plan was infeasible, coming from Snyder, who has since appealed the entry of the confirmation order.

The Plan contemplates a full payment to unsecured creditors. As a result, the status of the Company's large claim, whether deemed secured or unsecured, is significant to consummation of the Plan. The impact of this decision on the feasibility of the Plan is uncertain, although the Debtor's evidence at the confirmation hearing alleged that the Plan was feasible irrespective of the outcome of this controversy.

The Claim was filed on August 12, 1992. Attached to it was a Notice of Intention to File a Mechanic's Lien against Hunt's Pier Associates, Inc. ("the Notice"). The initial Objections to the Claim were filed the next day, August 13, 1992. Therein, the Debtor asserted, *inter alia,* that (1) the Debtor neither entered into a contract with, nor authorized any individual to contract with, the Company; (2) the Debtor was entitled to a setoff to the extent that the Company breached any contract which may have existed, and that such a claim had been raised in litigation pending in the New Jersey Superior Court ("the N.J. Court"); and (3) the Company's asserted mechanic's lien was not properly perfected, and, hence, the Claim was not secured.

The Debtor filed Amended Objections to the Claim on August 25, 1992, wherein it additionally averred that (1) the Claim was secured by other property, namely another Wildwood pier owned by Kami known as the Nilon Pier, upon which the Debtor believed the Company had already foreclosed in full satisfaction of the Claim; and (2) the value of this other secured property far exceeded the value of the Claim.

A hearing on the Amended Objections was originally scheduled on September 30, 1992. The hearing ultimately was continued four times, during which time the Company unsuccessfully argued that the disposition process should be relegated to the N.J. Court and tentative settlements were reported. In an Order of January 14, 1993, the hearing was continued one last time to February 10, 1993. A last-minute request by the Company for a further continuance was denied. The court agreed to initially hear the issue of liability and, if it ruled on this issue favorably to the Company, to thereafter consider the issue of the amount of the Claim. Ultimately, the hearing

stretched over four days: February 10, 1993, February 16, 1993, March 8, 1993, and March 18, 1993.

After the first two hearings, this court announced its intention to enter an interim Order holding that the Company did not have a valid mechanic's lien, or secured claim, against the Debtor, but that it may have a valid, unsecured claim against the Debtor. This Order was based upon a conclusion, similar to that reached in *Hunt I*, 143 B.R. at 49–50, that the mechanic's lien was invalid because it was docketed against an entity different from the Debtor. However, we recognized that different considerations could well enter the picture when the less technical issue of the Debtor's liability to the Company was considered. Recognizing the difficulties inherent in this latter issue, although concluding that the Debtor's liability was not foreclosed, we urged the parties to attempt to settle the matter at a midway figure. In the alternative, we directed them to determine what documentary evidence should be submitted from the Company's voluminous records in support of the amount of the Claim, and what portions of this evidence could be stipulated to by the Debtor. Ultimately, we were advised that the Debtor had no real dispute with the Company's contention that it did the work on which the Claim was based, the management of construction and financing of the installation of the aforementioned Ride on the Pier in spring and summer, 1989. Hence, the Claim, though very large, was not really contested in amount.

After the final day of testimony, we entered an Order of March 19, 1993, giving both of the parties an opportunity to file, simultaneously on April 9, 1993, supplemental Briefs and/or Proposed Findings of Fact and Conclusions of Law in support of their respective positions. We note that the Company had filed several Trial Briefs during the course of the hearing, and, on March 18, 1993, the final day of the hearing, the Debtor filed the comprehensive Proposed Findings of Fact and Conclusions of Law In Opposition to the Claim of Baumgardner Construction Company ("the Debtor's Proposed Findings"). In the Debtor's Proposed Findings, the Debtor argued, *inter alia:* (1) Kami did not have the authority to act on behalf of the Debtor or to bind it to his undertaking with the Company; and (2) the Company believed that it was dealing with Kami as an individual, and that the Company should not benefit from the Debtor's undisclosed "fortuitous" ownership of the Pier.

On April 8, 1993, the Company filed the Proposed Findings of Fact and Conclusions of Law By Claimant, Baumgardner Construction Company, Inc. ("the Company's Proposed Findings"). In the Company's Proposed Findings, it argued principally that (1) the Debtor and its other general partners were liable, as well as Kami, for its services to the Pier, since Kami had "apparent authority" to bind the Debtor when he contracted with the Company; and (2) pursuant to N.J.STAT.ANN. §§ 42:1–9(1), (2), even a partner whose actions exceed that partner's authority nevertheless binds a partnership if the person with whom that partner is dealing has no knowledge of the limitations of that partner's authority.

## C. FACTUAL HISTORY

As is noted above, much of the factual history of the Debtor's operations can be gleaned from a review of *Hunt I*, 143 B.R. at 40–41. However, it will be recalled that the *Hunt I* record was created by a Stipulation of Facts to which the parties never totally agreed. *Id.* at 40. Therefore, this history is herein expanded and, where necessary, corrected.

We pick up this history as of July 8, 1988, after Kami and S & S agreed to redeem Snyder's interest in the Debtor. *See id.* at 40–41. Following Snyder's withdrawal from the Debtor, the remaining partners entered into a letter agreement on July 8, 1988, the purpose of which was to (1) reflect the agreement regarding the redemption of Snyder's interest in the Debtor; (2) describe the framework for which income, losses, and existing capital accounts would be treated and allocated as a result of Snyder's redemption; and (3) provide the terms and conditions for the Debt-

or's restructuring and the means by which the Debtor would be dissolved ("the July Agreement").

Pursuant to the terms of the July Agreement, Kami was allocated thirty-seven (37%) percent of the Debtor's profits and losses as of the close of business on July 7, 1988. Kami was also apportioned seventy-five (75%) percent of the existing mortgage indebtednesses, which included the amount to be paid to Snyder ($2.3 million) and the remaining total amount ($7 million) of a $10 million loan from AFF to the Debtor for the acquisition of much of its property, including the Pier. Kami was granted the exclusive right to operate the Pier and the adjacent Ocean Block properties owned by the Debtor, but was not to incur any obligation or indebtedness on the properties for which S & S in connection with their operation of these properties would be liable. Kami was to receive "the benefits and burdens of all profits and losses related to these two properties." July Agreement, at 5. Further, Kami and S & S were entitled to use all

> revenues relating to or arising out of the operation of their respective properties without interference from the other and [could] maintain separate and independent bank accounts on which each of them [would] have exclusive signing authority, *even though the accounts [would] be maintained in the name of the partnership*....

Moreover, Kami agreed

> to indemnify and hold harmless Messrs. Stein and Silverman from and against all claims any losses, causes of action, and damages of any kind or description whatsoever, including counsel fees, arising out of or relating to the operation of the Pier and Ocean Block properties.

*Id.* at 5, 10.

The July Agreement anticipated that an amended and restated partnership agreement would subsequently be prepared, which would flesh out the terms contained within the July Agreement and provide additional warranties and representations. Such a later agreement was entered into in the form of a letter agreement of October 18, 1988 ("the October Letter"). Though the terms of the October Letter superseded those of the July Agreement, the above language was not altered. There was apparently another recent amendment to the July Agreement between Kami and S & S to aid in effectuation of the Plan, but this is not of record.

During summer, 1988, Kami experienced difficulty paying his seventy-five (75%) percent share of the Debtor's mortgage indebtedness, because the Pier did not generate sufficient income. For this reason, he sought permission to erect the Ride on the Pier, which he hoped would generate sufficient revenues to meet his commitments under the October Letter. Permission to do so was expressly granted by S & S. In connection therewith, on January 17, 1989, the Debtor, through the unanimous action of Kami and S & S, granted to Foreca, S.A., a Netherlands company which was the manufacturer of the Ride ("Foreca"), a mortgage on the Pier and the Ocean Block as additional security for the Ride. The form of the agreement was that Foreca would continue to own the Ride and to lease it to Kami. S & S, as well as Kami, signed the Foreca mortgage on behalf of the Debtor.

In his several appearances as a witness, Silverman, on behalf of S & S, conceded that he was aware of the likelihood that the Company had a claim against the Debtor, which he stated, without dispute, was at all pertinent times the title holder of record of the Pier. However, he also testified that he was unaware of any contact between the Company and the Debtor. Nevertheless, Silverman conceded that S & S never took any initiative to ascertain the terms of any contract for the Ride's erection from either Kami or the Company. Therefore, he stated that he was not aware of any oral discussions which authorized the Company to perform any services for the Debtor. He also testified that he did not observe any equipment identifying the Company as the construction contractor on the Pier at any time. However, he admitted that he visited the Pier as many as three times in summer, 1989, and saw the installation of

the Ride being accomplished and, finally, the Ride in place. He did not indicate any efforts to ascertain the liabilities incurred for installation of the Ride. He contended that he first became aware that *the Company* was involved in erecting the Ride when he was served, in 1990, with papers in the N.J. Court action, which had been commenced on October 26, 1989.

Baumgardner, the principal and sole shareholder of the Company, also testified at length. He testified that the Company engages in general construction and carpentry construction in the southern New Jersey area. The Company became involved with the erection of the Ride via a third party who prompted Baumgardner to contact Kami and set a meeting for mid-March, 1989. When he met with Kami, Baumgardner stated that Kami had either represented himself as the owner of the Pier or as the representative of the Pier's owner. Throughout his testimony, perhaps in the nature of a Freudian slip or a reiteration of his impressions at the time of the negotiations, Baumgardner repeatedly referred to Kami as the owner of the Pier. He testified that he believed that Kami, as the owner or the person put in charge of the Pier, would stand by his word to pay the Company for its services. He admitted that he was not aware of the Debtor at all, but believed that Kami, on behalf of the owner of the Pier, was entering into an agreement with the Company. He stated that Kami, who never was located or called to testify in these proceedings (but whom the court, from previous experience, believes would have been unlikely to present productive testimony, due to a language problem and a general air of incoherence) never did disclose that he was acting on behalf of the Debtor. From his testimony and the Mechanic's Notice, it appears most likely that Baumgardner believed that Kami may have represented Hunt's Pier Associates, *Inc.* rather than the Debtor.

Baumgardner testified that the Company's primary focus was on timely completion of the Ride project. As a result, he stated that he did not spend any amount of time scrutinizing how Kami was signing documents. The entity that the Company billed for its services was either Hunt's, Inc., or Hunt's Pier Associates, Inc. The subcontractors involved used an assortment of other variants of "Hunt's Pier" for billing the project. In answer to the question of whether Baumgardner had verified Kami's authority to act for the actual owner(s) of the Pier, Baumgardner testified that

I did nothing ... in responding to his demand[s]. I showed confidence that he had the authority to be telling me that he was in a position to make these arrangements.

At his first meeting with Kami, Baumgardner discussed several matters, including the parameters of the Ride project. Kami emphasized the necessity of having the Ride erected by July 4, 1989, while the 1989 summer season was at its height. Baumgardner asserted that the information Kami had available was sparse at best. At this meeting, it was readily apparent to Baumgardner that Kami was the decision-maker and person "in charge." At the first meeting, Kami had given Baumgardner permission to contact other persons who were already "on board" for additional information on the Ride project. Baumgardner indicated that he had done so.

At a second meeting in mid-March with Kami, Baumgardner recommended that Kami begin formulating project dates and deadlines and assembling engineers, contractors, consultants, and any other potential bidders on the project before the next meeting between them. The third meeting with Kami was relatively short and consisted largely of Baumgardner's delivering his bid proposal to Kami. He confirmed with Kami his proposal amount, approximately $488,000.00, and the scope of work involved. Baumgardner testified that Kami was very disturbed by the amount of the bid and indicated that it was much more than he had anticipated. Baumgardner testified that he left the third meeting with little understanding of his role on the Ride project, but very aware of Kami's consternation about the project's potential costs.

Kami's apparent discomfort at the Ride project's costs were clearly manifested at a fourth meeting in March with Baumgardner. At this meeting, Baumgardner testified that Kami was attempting to ascertain a means by which the Ride project could be consummated for less. Eventually, the discussion shifted to whether Baumgardner would agree to be the Ride project's construction manager with oversight responsibilities instead of being its contractor. Kami had proposed that he would supply the requisite labor, materials, and sub-contractors for the term of approximately three months required for erection of the Ride. Baumgardner, on behalf of the Company, agreed to such a management role for the payment of $75,000.00. According to the discussion at this point, which Baumgardner refused to refer to as an affirmative "agreement," the Company would both manage and, where necessary, perform construction services with its own labor and materials. Any monies expended for materials and supplies would be reimbursed at cost plus an additional fifteen (15%) percent. Further, the Company would provide an on-site manager for the project to supervise daily activities and the sub-contractor/supplier work force.

Baumgardner testified that he came away from this meeting believing that he had been retained as a construction manager. In explaining the payment arrangement for the $75,000.00 management fee, Baumgardner testified that payment was to be made incrementally, (1) $25,000.00 at the beginning of the Ride Project, (2) $25,000.00 when either thirty-five (35%) percent or fifty (50%) percent of the Ride project was completed, and (3) $25,000.00 when the Ride project was seventy-five (75%) percent completed. He asserted that Kami had not envisioned the Company's paying for the subcontractors' services. However, because of the Ride project's short time frame and the significant amount of money he expected to be expended, Baumgardner informed Kami that he expected to be paid on a weekly basis. The first $25,000.00 of the management fee was paid by Kami to the Company.

Baumgardner admitted that the agreement reached with Kami was oral and had not been reduced to writing. The Company's business manager tried unsuccessfully several times to have the agreement between the Company and Kami memorialized. However, Kami never signed any such document.

Baumgardner testified that, although the scope of the original agreement between him and Kami was merely to supervise the project,

it immediately moved into us [the Company] being involved with laborers and subcontractors. It was an enormous scope of work starting with the demolition of an existing structure [which] had to be almost completely removed to allow for the construction of the roller coaster. There was a tremendous amount, approximately sixty (60%) percent, of work which had to be done below the boardwalk of the Pier. A "massive" foundation had to be constructed to support the Ride, areas had to be de-watered and excavated, [and] [h]uge amounts of concrete and reinforcing steel had to be placed in the ground to support the Ride.

Baumgardner further testified that, from the first day of the Ride project, the Company assumed the responsibility for providing workers on the project. Further, he stated that, as time progressed, it became clear that there were many "loose ends" to the project which he felt should have been tied by Kami. For example, Kami had not made arrangements for transportation of the Ride from the Netherlands to the Pier.

The agreed payment arrangement was that, at the end of each week, all expenses for labor and materials, with the appropriate "mark-up," were to be tallied. The bill for that week was then to be submitted to Kami, who would issue a check for the billed amount. According to Baumgardner, an agreement to these terms was to have become effective immediately, on either March 20, 1989, or March 22, 1989.

Baumgardner testified that the enormity of the Ride project contributed to its notoriety and made it the subject of several articles in area newspapers:

[There were] 75 ton, 100 ton, 150 ton cranes, there were at least four huge cranes hovering over this project for at least six to eight weeks picking huge pieces of steel from the tractor trailer and putting them in place. This could be seen for five [or] six miles away. As you came off the [Garden State] Parkway you could see these cranes ... It could be seen up and down the beach, it was a very talked about project ... during the construction we occupied approximately fifty- [(50%)] percent of the property [the Pier], although the roller coaster, *per se*, may have taken up twenty [(20%)] percent.

However, despite the apparent enormity of the project, Baumgardner testified that he never talked to S & S—and that S & S never approached him to indicate that they were "owners" of the Pier, nor to give him any indication that there were limitations to Kami's authority with regards to the construction work on the project.

This court questioned Baumgardner as to whether he did not feel considerable apprehension in dealing with Kami, whom the court, from its experience, observed was an individual who appeared impulsive, difficult to understand, and hence not likely to have inspired confidence in his performance. Baumgardner replied that he became apprehensive enough to request payment on a weekly basis and to file the mechanic's lien. However, he testified that he became intensely focused on completing the Ride project by the prescribed July 4, 1989, deadline for its completion, which Kami reportedly emphasized.

On March 23, 1989, the mechanic's lien was filed in Cape May County, New Jersey, and Kami was mailed a copy of it. On the Notice, Baumgardner listed Hunt's Pier Associates, *Inc.* as the owner of the Pier, rather than the Debtor. Baumgardner acknowledged that, during the Company's dealings with Kami, he had seen "several different names" for the owner of the Pier, among them being Hunt's, Inc, Hunt's Pier, and Hunt's Pier Associates, L.P. Baumgardner stated that Kami protested the filing of the mechanic's lien and said

that it was interfering with his acquisition of financing for the Ride project. Baumgardner's reply to Kami was that Kami was not abiding by his agreement to pay the Company on a weekly basis; that the Company was expending a significant amount of money and had shouldered a large amount of responsibility; and that it would remain. The payments that were made to the Company from Kami were made via checks drawn on the account of Hunt's Pier Associates, *L.P.* (the Debtor is a general partnership and not a limited partnership or an "L.P.") and signed by Kami, in his capacity of Vice–President/Treasurer, except for one check which did not have the name of the maker. Of these five checks, Baumgardner testified that all of them were paid until a check dated April 27, 1989, in the amount of $92,000, was dishonored.

Baumgardner testified that, following dishonor of the April 27 check, payment by Kami came in "dribs and drabs here and there." He then demanded additional security for the Company's continued performance. Ultimately, Kami and a company of his, referenced as Zebra Diamond Co. ("Zebra"), agreed to grant the Company a third mortgage on the Nilon Pier, in the amount of $750,000.00, in order to prevent the Company's withdrawal from the project. The Nilon Pier Mortgage and an accompanying Note were dated May 18, 1989, and were signed by Kami, in his individual capacity and on behalf of Zebra. In response to our questioning as to whether the Company had made any investigations of the remaining equity in the Nilon Pier at this time, Baumgardner stated that, by the time that the Nilon Pier transaction was consummated, the Ride project had been completed. Also, it was brought out that the Company did not receive a title search of the Debtor's Pier until it requested same in conjunction with a search of the title of the Nilon Pier, on July 5, 1989. This search identified the Debtor as the owner of the Pier in fee simple.

According to Baumgardner, Kami had provided him with copies of agreement(s) of sale of the Nilon Pier for $8.8 million, as well as various leases, which Baumgardner

now claims were "bogus." Baumgardner stated that, due to his knowledge of the Nilon Pier as a well-located, prosperous enterprise, he was not skeptical of Kami's representations at the time that they were given. Based on the information with which he had been provided, he thought that the Nilon Pier was worth $8 million (or at least in excess of $5 million). Since it was encumbered with no more than about $4 million dollars in prior mortgages, it appeared to him that payment of his Claims in reference to the project would be adequately protected by the security of the Nilon Mortgage. His opinion as to value was based upon information his appraiser had given him, but who had, in turn, received his underlying data from Kami.

Baumgardner testified that, in the middle or latter part of April, 1989, Kami indicated to him that he was out of money and that the subcontractors were threatening to leave the project site. Kami asked Baumgardner whether he could

> for a short period of time, lend him money, or cover his expenses, or cover the expenses that he was incurring on a weekly basis until he was able to get the job refunded ... I [Baumgardner] knew this was true, because I knew that he had fallen behind on our weekly payments....

Knowing that, if the project stopped for even one day, he would fail to meet the crucial July 4th weekend completion date, Baumgardner reluctantly agreed that the Company would pay the sub-contractors for a short period of time. Ultimately, as time went on, the Company paid the subcontractors approximately $550,000.00 over the remainder of the project.

In a letter dated July 12, 1989, which enclosed the final invoices, the Company advised Kami that $944,179.71, including interest and penalties, was owed to the Company. Baumgardner testified that

> Kami was never sure of the exact dollar value and never acknowledged or indicated that he did not owe us large amounts of money, he did not say that, yes, $944,-179.71 was the exact amount. He was always in agreement that he owed us a considerable amount of money, that he spent the money and that we were entitled to it, but not specifically by this letter.

In a letter of June 27, 1989, received by Baumgardner on July 5, 1989, Kami, for the first time, complained about work which allegedly was not being performed to his satisfaction; commented with regret on his attempts to control costs by appointing the Company as his project manager; and declared that it had been the Company's responsibility to have the Ride operating for the July 4th weekend. Baumgardner stated that Kami also complained about the work performed on, and the cost associated with, the Ride when it opened for the July 4th weekend. He testified that this was the first time he had heard complaints from Kami and that Kami had complained about the "escalating" costs of the Ride project.

Thereafter, Kami defaulted on the Nilon Mortgage. Moreover, he also defaulted on the first and second mortgages on the Nilon Pier. As time passed, the amounts of the first and second mortgages on the Nilon Pier increased, assumably from addition of penalties, interest, and reimbursable costs. In August 1989, Baumgardner initiated foreclosure proceedings on the Nilon Pier and took title to it by a deed in lieu of foreclosure in October, 1991. However, the first mortgagee subsequently also foreclosed upon the Nilon Pier, and the Nilon Pier was bought by a third party in February, 1993, for approximately $3 million.

Over the Company's objection that this contention had no merit as a matter of law, the court, though expressing skepticism about its validity, allowed the Debtor to present evidence in support of its argument that the Company's foreclosure of the Nilon Pier should preclude the Claim, which was in the nature of a request for a deficiency after a foreclosure. The Debtor's main factual support for this contention was that the Nilon Pier was worth over $8 million when the Company acquired it and that it should have satisfied its entire Claim through disposition of the Nilon Pier. In support of this contention, the Debtor

called John Simpson, an expert appraiser who valued the Nilon Pier at $8,890,000 as of October 1, 1991.

The Company presented rebuttal in the form of testimony of Robert Bryson, the court-appointed rent receiver of Nilon Pier from June, 1991, through the 1992 season; and Robert M. Sapio, also an expert appraiser. Bryson's testimony supported the Company's contention that Kami grossly overstated the rentals due under the leases of his Nilon Pier tenants. Using Bryson's figures, Sapio valued the Nilon Pier for Corestates Bank, in December, 1992, at $2,850,000. He contended that the $3 million price realized at the sheriff's sale to an independent third party in February, 1993, was an accurate reflection of its present value and verified his own figures.

## D. CONCLUSIONS OF LAW/DISCUSSION

### 1. KAMI HAD ACTUAL AUTHORITY TO ACT AS THE MANAGER OF THE PIER.

■ One of the threshold points raised by the Debtor is that Kami not only did not have the actual authority to bind the Debtor to the contract with the Company, but also lacked authority to act at all as manager of the Pier on behalf of the Debtor. On its face, the relevant portions of the October Letter do not support this position. Contrary to Silverman's testimony, it seems clear to us, from the portions of the October Letter quoted below,[1] that the partners did anticipate, in the operation of their respective properties, that they could maintain independent bank accounts *in the name of the partnership* to which they would have exclusive signing authority. The maintenance of such accounts in the name of the Debtor do not reflect an intention to shield the Debtor entirely from liability.

Both the Debtor's Proposed Findings and Silverman's testimony assert that, in the October Letter, the three partners agreed not to incur any indebtedness on behalf, or in the name, of the Debtor. However, a close examination of the October Letter does not disclose the existence of such express language. What is stated in the October Letter is an attempt by the three

1. Effective as of the close of business, July 7, 1988, ... Kami shall have the exclusive right, except as provided below, to manage and operate the Pier and the Ocean block properties, and shall have allocated to him the benefits and burdens of all profits and losses related to these two properties ... Each of Kami, on the one hand, and Stein and Silverman on the other shall be entitled to use all revenues relating to or arising out of the operation of their respective properties without interference from the other and may maintain separate and independent bank accounts on which each of them shall have exclusive signing authority, *even though the accounts will be maintained in the name of the partnership;* provided however, the parties shall comply in all respects with the provisions of the AFF and Snyder mortgages.

After the close of business, July 7, 1988, *neither Messrs. Stein nor Silverman nor Kami shall incur any indebtedness for which the other (or the respective properties allocated to them under this Letter Agreement) shall be liable in connection with the operations of their respective properties.* It is the intention of the parties in this regard that even though the partnership will be maintained in existence until dissolved as set forth below, the practical operation of the partnership's assets and all risk of loss and potential for profit therefrom shall be treated as though there had been an in kind distribution of the partnerships assets as set forth above, subject to the allocations set forth herein and that the net economic benefits and risks to be shared during the balance of the term of the partnership will be allocated on the books of the partnership in a manner that would give the same effect as though the partnership had been now dissolved and the assets distributed as aforesaid; provided, however, that any and all tax benefits shared by the partners shall be preserved and remain intact and without reallocation.

Messrs. Stein and Silverman each hereby agree to indemnify and hold harmless from and against all claims, losses, causes of action, and damages of any kind or description whatsoever, including counsel fees, arising out of or relating to the operation of the Strand, Avalon and Cape May County Courthouse properties. Kami hereby agrees to indemnify and hold harmless from and against all claims any losses, causes of action, and damages of any kind or description whatsoever, including counsel fees, arising out of or relating to the operation of the Pier and Ocean Block properties.

October Letter at 5, 7–8, 11 (emphasis added).

partners to insulate themselves, rather than the Debtor, from any obligation or indebtedness flowing from their operation of the various allocated properties and to protect the individually-managed properties from liability and/or alienation. This is evidenced by the prohibition upon the partners to incur indebtedness which would make their fellow partners liable for, or the other properties in issue security for, any such obligations. However, there is no express language preventing Kami or S & S from incurring indebtedness on behalf of the Debtor, such as would result from a contractual obligation like the one which existed between the Debtor and the Company.

Of significance is language in the October Letter which contradicts the Debtor's argument that Kami did not have the authority to act on behalf of the Debtor because the October Letter effectively dissolved the Debtor. The pertinent language indicates that dissolution of the Debtor was not contemplated until April 1, 1991. Hence, by the terms of the October Letter, it was only as of April 1, 1991, that the Debtor would be dissolved and, *at that time*, Kami would not be able to act on behalf of the Debtor. Therefore, at the time that he was negotiating with the Company, Kami was capable of acting on behalf of the Debtor.

## 2. KAMI WAS CARRYING ON THE BUSINESS OF THE DEBTOR IN CONTRACTING WITH THE COMPANY.

Following from the foregoing argument of the Debtor, which we cannot accept, is its second argument that Kami was not carrying on the business of the Debtor when he hired the Company. We cannot accept this argument of the Debtor, either.

■ The parties agree, we think correctly, that this controversy must be decided under New Jersey law. The pertinent New Jersey statutory law regarding the authority of a partner to bind a partnership in which that partner is engaged is thusly stated in N.J.STAT.ANN. §§ 42:1–9(1), (2):

1. Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular manner, and the person with whom he is dealing has knowledge of the fact that he has no such authority. ·

2. An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by other partners.

We recognize that Kami's difficulties in paying his seventy-five (75%) percent share of the AFF Loan from the operation of the Pier and the Ocean Block, as was required by the October Letter, was the motivation which prompted his seeking permission from the other partners to erect the Ride. However, he did seek permission from the other partners to do so, they gave such permission, and the contract in issue, arising from the Ride's erection, was a natural consequence of the installation of the Ride. While Kami was seeking to meet his personal partnership obligations, he was also doing this by means of a transaction which not only was the "usual way" for an amusement pier to do business, *i.e.*, installing rides on it in order to generate revenue from customers' patronage of the rides, but also he was utilizing a means which was done with the full consent of the other partners, and, therefore, effectively bound the Debtor.

It is true that, in light of the contents of the July Agreement and the October Letter, the partners contemplated that Kami would operate the Pier and (possibly) engage a contractor to install the Ride in his name or the name of his own separate corporation. It is also true that Kami, whether by design or unintentionally as a result of his own disorganization, used several variations of the Debtor's name in his dealings with the Company, and apparently did not use the Debtor's name, nor did he

represent himself as a partner or agent of the Debtor, nor did he involve the Debtor with the Company and the other parties involved in the Ride project in these negotiations. However, it is not clear that such actions effectively shielded the Debtor from liability. The Debtor's other partners, S & S, effectively "laid low" and closed their eyes to the Debtor's potential involvement with the Company, although they were clearly aware that, for the benefit of the Debtor, the Ride was being installed on the Pier. Such conduct was not particularly equitable to the Company, nor, as we find *infra*, was it sufficient to shield the Debtor from liability.

It is also clear that Baumgardner believed that Kami was the owner of the Pier, or, in the alternative, represented some entity which owned the Pier. Baumgardner never recognized this ownership entity to be the Debtor during the short term of the Ride project, or the prolonged period afterward. He relied solely on Kami, his own errant mechanic's lien filing, and ultimately, his taking a security interest in Kami's personal interest in the Nilon Pier, as his security for payment. He thus looked solely to Kami and his personal entities and assets for payment, and not to the Debtor. In his perspective, the Debtor was nothing more than an unknown and undisclosed principal of Kami. The course of dealing with Kami engaged in by Baumgardner does not reflect ordinary business acumen, and Baumgardner has paid dearly for this. He indicated at trial that he had expended over $300,000 in legal bills in pursuing this obligation, and we have already decided that his mechanic's lien is invalid. However, these considerations are only part of what we must consider in deciding the Debtor's liability to the Company.

3. THE DEBTOR, AS KAMI'S UNDISCLOSED PRINCIPAL, IS LIABLE TO THE COMPANY FOR ITS SERVICES, SINCE SAME WERE "USUAL" IN THE DEBTOR'S BUSINESS.

■ A good statement of what we conclude is the controlling legal authority is contained in 59A AM.JUR.2d 553 (1987):

§ 636. Dormant, silent, or secret partners

A dormant, silent, or secret partner who participates in partnership profits may be held subject to the normal liabilities of partners, at least as long as he remains a member of the firm, because the law will not allow a dormant partner secretly to share in the profits of the firm without taking his share of the risks and bearing his share of the losses as to third persons. Thus, a creditor is entitled to recover from all the partners, including secret or dormant partners, even though one partner holds himself out as the sole owner of the business, and in spite of any agreement between the parties purporting to limit the liability of the dormant partner (footnotes omitted).

Thus, there is a policy of holding undisclosed partners to the undertakings of a co-partner who holds himself out as the sole owner of the business, as did Kami to the Company, even though, as per the July Agreement and the October Letter, the other partners purported to limit their liability and the liability of the Debtor. New Jersey law is consistent with these principles. *See Levy v. Iavarone*, 9 N.J.Misc. 450, 154 A. 527 (1931) (lack of third party's knowledge of a "silent partner's" involvement or of the existence of a partnership does not preclude that party from holding a silent partner liable).

■ Additional support for this conclusion can be drawn from the principles of general agency law. As N.J.STAT.ANN. § 42:1–9(1) expressly provides, each partner is an agent of the partnership. *Accord, e.g., Eule v. Eule Motor Sales*, 34 N.J. 537, 542–43, 170 A.2d 241, 243 (1961); and *Levy, supra*, 9 N.J.Misc. at 450, 154 A. at 527.

Under familiar principles of agency law, if an agent discloses his principal and acts within his authority, suit can be brought only against the principal. If the agent does not disclose his principal and purports to be acting for himself, the third person, upon ascertaining the principal-agent relationship, has an alterna-

tive remedy, *i.e.*, he may elect to hold the agent personally liable, *or* he may sue the principal. . . .

*Moss v. Jones*, 93 N.J.Super. 179, 183, 225 A.2d 369, 371 (App.Div.1966). *See also Greenberg v. Palmieri*, 71 N.J.L. 83, 58 A. 297 (1904); and 3 AM.JUR.2d 825–30 (1986).

■ We must observe that, in one respect, we find the legal analysis of the Company to be wanting. It argues that Kami was imbued with "apparent authority" to enter into contractual relations with the Company. However, in order to establish that apparent authority existed, the Company was obliged to prove that (1) *the Debtor* made representations or exhibited conduct, (2) which was relied upon by the Company, and that (3) such reliance was reasonable under the circumstances. *See Shadell v. Shell Oil Co.*, 195 N.J.Super. 311, 316, 478 A.2d 1262, 1265 (1984).

■ However, from the evidence before us, it is quite clear that the Debtor, either through the actions of its partners or otherwise, did not exhibit conduct or make any representations to Baumgardner that, as to the Company's participation in the Ride project, Kami was its agent, or that Kami was imbued with any type of authority. Baumgardner never met, or even spoke, with S & S during the performance of his duties. He firmly believed that Kami was the owner of the Pier, and he claimed to have never known of the Debtor's existence during the course of his business dealings with Kami. Hence, the Company's reliance on Kami's authority to act for the Debtor was not based upon the representations or conduct by the Debtor, but was derived from the acts, conduct, and representations of Kami, and from the agency relationship between the Debtor and Kami itself. Hence, "apparent authority" of Kami to act for the Debtor in his dealings with the Company was not present.

However, as the RESTATEMENT (SECOND) OF AGENCY, § 194, Comment *a*, at 430 (1958) ("the Restatement"), thusly makes clear, this factor is not decisive in favor of the Debtor:

*a.* Since apparent authority is the power which results from acts which appear to the third person to be authorized by the principal, if such person does not know of the existence of a principal there can be no apparent authority. Hence, the liability of the principal is not derived from the exercise of apparent authority by the agent. There may be, however, an apparent ownership, and from this there may be a power to affect the interests of the principal aside from any rule of agency. The rule stated in this Section is a companion to that stated in Section 161 (disclosed or partially disclosed principals) and the Comments to that Section are applicable. Both rules are examples of inherent agency power.

The Restatement, at §§ 194, 195, at 430, 431, thusly recites the rules of law, consistent with the New Jersey cases, which controls this dispute:

### § 194. Acts of General Agents

A general agent for an undisclosed principal authorized to conduct transactions subjects his principal to liability for acts done on his account, if usual or necessary in such transactions, although forbidden by the principal to do them.

### § 195. Acts of Manager to be Owner

An undisclosed principal who entrusts an agent with the management of his business is subject to liability to third persons with whom the agent enters into transactions usual in such businesses and on the principal's account, although contrary to the directions of the principal.

Kami was placed to the position of a "manager appearing to be the owner" of the Debtor by all of the Debtor's partners, including S & S. The transactions of Kami with the Company were "usual" for the Debtor in the sense that they were necessary and foreseeable to effect Kami's expressly-authorized acquisition of the Ride from Foreca. Kami's deviations from the authority which he was given to manage the Pier in the July Agreement and the October Letter were his failure to make it clear to the Company that he was acting on behalf of himself or his own corporate enti-

ties and not the owner of the Pier, the Debtor. These deviations from the Debtor's authorized scope of activities were neither knowable nor foreseeable on the part of the third party, *i.e.*, the Company. Therefore, they are insufficient to shield the Debtor from liability for the Company's services.[2]

### 4. THE INSTANT RESULT IS CONSISTENT WITH THE RESULTS IN HUNT I AND ANOTHER PRIOR DECISION OF THIS COURT INTERPRETING NEW JERSEY PARTNERSHIP LAW.

Before leaving this issue, we deem it appropriate to compare the instant result with the results in *Hunt I, supra;* and with another proceeding in which this court interpreted N.J.STAT.ANN. §§ 42:1–9(1), (2), *In re Lloyd's Securities, Inc.,* 1992 WL 165962, slip op. at *9–*14 (Bankr.E.D.Pa. July 10, 1992).

In *Hunt I,* at issue was whether Vekoma had a valid security interest in the rides in question. Consistent with that decision is our instant finding that Kami was found to have acted as the Debtor's agent in the management of the Pier, in that case in the act of purchasing the rides in issue there. 143 B.R. at 46–47.

However, in bankruptcy, per 11 U.S.C. § 544(a), security interests are subject to avoiding powers of a trustee standing in the shoes of an ideal lien creditor, judgment creditor, or bona fide purchaser for value. *Id.* at 49. The failure of the Company to properly designate the Debtor as the owner of the Pier on its mechanic's lien filing is comparable to Vekoma's failure to properly identify the Debtor on its financing statement. *See id.* at 49–50. This reasoning supports the conclusion that the Company's mechanic's lien and its con-

sequent secured status cannot be sustained. However, the general liability of the Debtor to a creditor is usually, as in this instance, controlled by applicable state law and this liability may result in a valid unsecured claim even if a security interest relative to the claim is avoidable.

In *Lloyd's Securities, supra,* the court was faced with an almost archetypical situation where managing partners were acting outside of their "usual" authority to conduct business: they were converting corporate assets to their own purposes. Slip op. at *9–*12. In such circumstances, the third party's errant investigation of the managing partners' authority to act became highly significant. *Id.* at *12–*14.

By way of contrast, the nature of the actions of Kami in issue here were well known to the co-partners, and S & S had ample knowledge and resources to investigate the complete circumstances of the Debtor's relationship with the Company. Also, the Debtor benefitted directly from the Company's services by acquiring the installation of a large attraction on its pier. That the Ride proved less profitable than was anticipated was due to business conditions for which the Debtor necessarily must accept the primary risk. Meanwhile, the partnership at issue in *Lloyd's Securities* could not, under any circumstances, have received any benefit whatsoever from the transactions challenged. It only received an unrequited encumbrance on its assets.

### 5. THE COMPANY IS NOT BARRED FROM ASSERTING ITS CLAIM AS A RESULT OF ITS FORECLOSURE ON THE NILON PIER.

Finally, we will briefly consider the Debtor's weak alternative argument that,

---

**2.** We note the following Illustrations from the Restatement, at 431–32, which support the conclusions that the Debtor is liable to the Company:

> 1. P employs A to manage his public house, directing A to represent that he is the owner, and to purchase no goods for the business except ales and bottled water, all other goods to be supplied by P. A purchases cigars from T for the business. P is subject to liability to T for the price of the cigars.

> 2. P employs A to manage his transfer business, permitting A to appear as the owner. He directs A to make no settlements with patrons of losses in excess of twenty dollars, until after consultation with him. T claims that he has suffered a loss by the negligence of one of the expressmen and A agrees, without consultation with P, to reimburse T by payment of $50. P is subject to liability upon the agreement.

**450**

under applicable New Jersey law, it would be inequitable for the Company to obtain a claim in the nature of a deficiency against the Debtor subsequent to its foreclosure on the principal security taken in the transaction, *i.e.*, the Nilon Pier. We will accept, *arguendo*, the Debtor's assertion that *Citibank, N.A. v. Errico*, 251 N.J.Super. 236, 247, 597 A.2d 1091, 1097 (App.Div.1991), stands for the principle that equitable considerations may be employed to preclude deficiency claims in *any* circumstances, not only those within the scope of N.J.STAT. ANN. § 2A:50–2.3, and in instances involving foreclosures on junior mortgages. *But see Central Penn Nat'l Bank v. Stonebridge Ltd.*, 185 N.J.Super. 289, 297, 448 A.2d 498, 501 (1982) (relief from a deficiency claim cannot be granted as to a second mortgagee).

However, we find no inequities in the Company's actions. Clearly, the Company has not received the windfall of reaping a profit from recovery of mortgaged property *and* a deficiency in addition in this factual setting. *See Errico, supra*, 251 N.J.Super. at 247, 597 A.2d at 1097. Whatever the value of the Nilon Pier in October, 1991, and we are very skeptical of the accuracy of Simpson's conclusions as to value,[3] based as they are on faulty data from Kami, the Company received no benefit from its foreclosure sale. It did not retain its title to the Nilon Pier in the face of the first mortgagee's subsequent foreclosure, and we find no credible evidence to support the conclusion that it should or could have remained the Nilon Pier's owner without an imprudent investment of capital on its part. Clearly, the Company, having

no further interest in the Nilon Pier and, thus far, no recovery from an elusive Kami or anyone else, and being out over $300,000 in legal costs incurred in pursuit of this claim, has received no windfall.

Therefore, we decline the Debtor's invitation to apply *Errico* against the Company's Claim in the instant factual setting.

### E. CONCLUSION

We will allow the Company's Claim, the specifics of which have not been contested, as an unsecured claim in almost the full amount presently sought, *i.e.*, $1,089,029.[4]

---

3. The valuation of Sapio, obtained in an engagement for Corestates Bank, a third party which had no bias in favor of any interested party in this controversy at that time, appears more likely to be accurate than that of Simpson, which was commissioned by the Debtor to serve its ends in this controversy. *See In re Cole*, 81 B.R. 326, 329 (Bankr.E.D.Pa.1988); and *In re Blakey*, 76 B.R. 465, 469–72, *modified on other grounds*, 78 B.R. 435 (Bankr.E.D.Pa.1987).

4. At trial and in its post-trial submissions, the Company concedes that the principal balance of its Claim is only $917,000. Additional interest at the New Jersey statutory rate of eight (8%) percent is sought from May 1, 1988, to the date

of the filing of the case on October 23, 1991. These assertions of the Company allegedly support the total claim of $1,100,000 which it requests in the Company's Proposed Findings.

We are uncertain why interest would be payable from May 1, 1988, since it would appear to us that the Claim accrued no earlier than July 4, 1989, when the engagement was completed. Calculating interest at .67 monthly (slightly over 8% per annum) for 28 months (slightly less than the applicable period), yields an additional interest charge of $172,029. This figure added to the $917,000 principle balance, yields our final calculated claim of $1,089,029.